IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01828-MSK-MJW

COPPER OAKS MASTER HOME OWNERS
ASSOCIATION, a Colorado corporation,

       Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,
a corporation,

       Defendant.

---

### DEFENDANT'S MOTION TO VACATE APPRAISAL AWARD

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................iii

CERTIFICATE OF CONFERRAL ............................................................................. 1

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

I.     THE MERLIN-KEYS-NORTON INSURANCE SCHEME.............................. 2

       A.     Keys is a Multi-Decade Client of Merlin............................................... 2

       B.     Keys Advertises His Bias in Favor of Policyholders............................. 3

       C.     Keys Makes Millions of Dollars from Contingency Fee Contracts....... 4

       D.     Keys and Merlin Founded a Florida Lobbying Group to Advance Their
              Mutual Business Interests ....................................................................... 6

       E.     Norton Misrepresents Himself as "Local" to Gain Umpire Jobs........... 8

       F.     Merlin Appoints Norton Pursuant to Their "Umpire Shopping" Scheme ............. 9

       G.     Merlin-Keys-Norton Exposed in Colorado: Merlin Attorneys Sanctioned,
              Keys Disqualified, and Norton Appraisal Vacated ............................... 11

II.    THE CONDITION OF THE SUBJECT PROPERTY ..................................... 15

III.   COPPER OAKS' DEMAND FOR $3.5 MILLION ....................................... 17

IV.    THE APPRAISAL .......................................................................................... 18

       A.     Copper Oaks Appoints Keys and Norton to the Appraisal Panel ......... 18

       B.     Whipple Finds Minimal Damage at Copper Oaks ................................ 19

       C.     Keys Estimates an Astounding $5 Million in Damages ........................ 20

       D.     Norton Hires EPI to Strike the Brick with a Steel Hammer ................. 21

       E.     Norton Attempts to Coerce Whipple into Signing the Inflated Appraisal
              Award by Threatening to Increase the Award Even More ..................... 22

i

ARGUMENT ..................................................................................................................... 23

I.      AN APPRAISER'S DUTY OF IMPARTIALITY ........................................................... 23

        A.      Colorado Embraces High Standards of Appraiser Impartiality ........................... 23

        B.      *Dakota Station II* is Not Controlling ................................................................... 25

II.     AN APPRAISER'S DUTY TO DISCLOSE ................................................................... 27

III.    THE APPRAISAL AWARD MUST BE VACATED ..................................................... 29

        A.      Keys Is Not Competent and Impartial ................................................................. 30

        B.      Keys Failed to Make Disclosures Required by Colorado Law ............................ 32

        C.      Norton Is Not Competent and Impartial .............................................................. 34

        D.      The Copper Oaks Appraisal is the Product of Partiality and Incompetence ........ 35

CONCLUSION ................................................................................................................... 37

# TABLE OF AUTHORITIES

## CASES

*Abdelsamed v. New York Life Ins. Co.*,
  857 P.2d 421 (Colo. App. 1992) ............................................................................. 28

*American Family Mutual Insurance Company v. Gallery at the Ranch Condominium Association*,
  2015CV31541 (Adams Cty.) ................................................................................... 34

*Auto-Owners Insurance Co. v. Summit Park Townhome Assoc.*,
  198 F. Supp. 3d 1239 (D. Colo. 2016) ........................................................... passim

*Auto-Owners Insurance Co. v. Summit Park Townhome Assoc.*,
  No. 14-cv-03417-LTB, 2016 WL 1321507 (D. Colo. Apr. 5, 2016) ................. passim

*AXIS Surplus Insurance Company v. City Center West, LP,*
  2015CV30453 (Weld Cty Dist. Ct.) ................................................................ passim

*Church Mutual Insurance Co. v. Broadmoor Community Church*,
  No. 2015CV32454 (El Paso Cty. Dist. Ct., Colo. July 6, 2016) ............ 14, 24, 25, 31

*Church Mutual Insurance Co. v. Coutu*,
  No. 17-cv-209 (D. Colo. Sept. 13, 2017) ................................................. 27, 28, 33

*Colo. Hosp. Servs. Inc. v. Owners Insurance Co.*,
  No. 14-CV-001859-RBJ, 2015 WL 4245821
  (D. Colo. July 14, 2015) ......................................................................................... 24

*Great Northern Insurance Co. v. 100 Park Avenue Homeowners Assoc.*,
  No. 16-cv-2009 (D. Colo. Mar. 13, 2017) .................................................. 14, 15, 31

*Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*,
  965 P.2d 105 (Colo. 1998) ............................................................................... 27, 33

*Monaco Beach Club, Inc. v. QBE Ins. Corp.*,
  06-2066CA (Collier Cty.) .......................................................................................... 6

*Nasca v. State Farm Mut. Automobile Ins. Co.*,
  12 P.3d 346 (Colo. App. 2000) ............................................................................... 28

*Noffsinger v. Thompson*,
  54 P.2d 683 (Colo. 1936) .................................................................................. 24, 34

*Owners Insurance Co. v. Dakota Station II Condo Association*,
  No. 16CA0733, 2017 WL 3184568
  (Colo. App. July 27, 2017) ................................................................. 25, 26, 34, 35

*Providence Wash. Ins. Co. v. Gulinson*,
  215 P. 154 (Colo. 1923) ..................................................................... 24, 26, 34, 37

*Simat v. Tower Ins. Co. of N.Y.*,
  No. 14-008969 (N.Y. Sup. Ct. Nassau Cty. Nov. 25, 2014) ...................................... 9

*Soicher v. State Farm Mut. Auto. Ins. Co.*,
  351 P.3d 559 (Colo. App. 2015) ................................................................... 24

*St. Paul Fire & Marine Ins. Co. v. Walsenburg Land & Dev. Co.*,
  278 P. 602 (Colo. 1929) ............................................................................ 24

*Webco Indus., Inc. v. Thermatool Corp.*,
  278 F.3d 1120 (10th Cir. 2002) .................................................................... 26

## OTHER AUTHORITIES

15 Couch on Ins. § 211:33 ............................................................................. 24, 27

Black's Law Dictionary ................................................................................. 25

Restatement (Second) of Torts § 551 ................................................................. 27

The undersigned counsel certified that he has conferred with counsel for Copper Oaks Master Home Owners Association ("Copper Oaks"). Copper Oaks opposes this motion.

**INTRODUCTION**

This case involves another inflated appraisal award procured by improper means by the Merlin Law Group, P.A. ("Merlin"), George Keys, and Robert Norton. After a dearth of Florida hurricanes, Merlin, Keys, and Norton transported their bad faith appraisal tactics to Colorado. The scheme, however, has met resistance from this Court. Merlin's, Keys', and Norton's improper appraisal tactics were exposed in *Auto-Owners Insurance Co. v. Summit Park Townhome Assoc.*, which led the court to vacate the appraisal award in that case and impose severe sanctions on two Merlin lawyers and their client. Case No. 14-cv-03417-LTB, 2016 WL 1321507 (D. Colo. Apr. 5, 2016).

Unrepentant, Merlin, Keys, and Norton thereafter orchestrated a similarly inflated appraisal award in this case through the same bad faith tactics, misrepresentations, and defiance of the rule of law that they used in *Summit Park*. Specifically, as detailed herein, Merlin, Keys, and Norton concealed the true nature of their relationships, and procured an appraisal award for *millions* in excess of actual damages. Norton even attempted to strong-arm the third member of the appraisal panel into signing the inflated award by threatening to inflate the award even more. These actions were taken in violation of the insurance policy and Colorado law. This motion is supported not only by extensive documentary evidence, but also by declarations submitted by JR Whipple, the appraiser who interacted with Keys and Norton in the appraisal, as well as Steven

Plitt, a nationally renowned expert on insurance matters, including bad faith. The appraisal award must be vacated as a matter of law.

**BACKGROUND**

**I.    THE MERLIN-KEYS-NORTON INSURANCE SCHEME**

After Keys and Norton issued their unreasonably inflated $3 million appraisal award in this matter, Defendant American Family Mutual Insurance Company ("American Family") retained additional counsel to investigate why the appraisal award had exceeded any remotely reasonable figure by millions of dollars. American Family discovered that Keys and Norton are not "competent and impartial" appraisers as required by the insurance policy and Colorado law. They engaged in illegal, dishonest, and biased misconduct to create the present award.

**A.    Keys is a Multi-Decade Client of Merlin**

Far from being impartial, Keys is a business associate and past fiduciary of Merlin. The Merlin-Keys business relationship dates back to at least 1995, when Keys and Merlin joined forces to sue an insurance company, with Keys as a Merlin client. In February 1995, Keys sued Allstate Insurance Company in Florida. Chip Merlin, the founder and President of the Merlin Law Group, represented Keys in that lawsuit. (Wall Decl. Ex. 1.)

In 1997, Keys commenced another lawsuit in Florida. Douglas Grose, who subsequently joined Merlin, represented Keys in that proceeding. (Wall Decl. Ex. 2.)

Also in 1997, Grose represented Keys in establishing his public adjusting business, Howarth, Keys, McCrory & Associates, Inc. ("Howarth Keys"), by filing the company's Articles of Incorporation. Grose is named as the Incorporator of Howarth Keys and served as its registered agent from 1997 until 2007. (Wall Decl. Ex. 3.) Keys then established another

business, Keys Claims Consultants, Inc. From 2008 to 2010, Merlin was the registered agent for

that business in Texas. (Wall Decl. Ex. 4.) These relationships alone preclude any suggestion that

Keys can be impartial in any appraisal involving his law firm and agent, Merlin. But there is

much more.

### B.     Keys Advertises His Bias in Favor of Policyholders

Both Keys and Merlin admit that Keys is biased in favor of policyholders. Keys admits

that his pro-policyholder bias extends to appraisals, and he affirmatively rejects the idea that he

should be free from "bias or ill motives" during an appraisal:

> Q.       . . . What is your understanding of the meaning of the word impartial, in
> the context of an appraisal?
>
> A [Keys].       Not dependent on others.
>
> Q.       Okay. Would you consider within that definition to be free from bias or ill
> motives?
>
> A.       No, I can't say that anyone serving as an appraiser, in the role as an
> appraiser, could ever be an advocate without being somewhat biased or at least an
> advocate.

(Wall Decl. Ex. 8.)

Merlin attorney David Pettinato provided Keys an enthusiastic testimonial, saying: "Both

Mr. Keys and his staff have assisted me as well as my firm in resolving an *untold number of*

*large multi-million dollar losses* to an amicable resolution and settlement to the policyholders'

benefit and satisfaction." (Wall Decl. Ex. 5 at 5.) On his website, Keys boasts that "Keys Claims

Consultants, Inc. has extensive experience *representing the insured* in the Appraisal process . . . .

Our principal, George W. Keys has participated in several thousand Appraisals *on behalf of the*

*insured* over the course of his career." (Wall Decl. Ex. 6 (emphasis added).) Keys does not claim

to have ever represented an insurer in an appraisal.

Merlin's marketing material overtly acknowledges Keys' pro-policyholder bias. Merlin published on its website a glowing profile of Keys, reporting that he "has dedicated his professional life to being a voice for policyholders in property insurance claims," and further quoted Keys as saying, "I was taught to always handle a claim as if my *momma was the insured*." (Wall Decl. Ex. 7.) The article goes on to claim that since 1993, Keys "decided it was time to use his skills to help *only policyholders*[.]" (*Id.* (emphasis added).)

Keys has also launched an insurance-recovery business, Risk Worldwide, which is a "natural disaster insurance recovery" firm operating in Christchurch, New Zealand. (Wall Decl. Ex. 9.) His business partners in this venture are prominent members of the policyholders' bar. (*Id.*) Risk Worldwide's website states: "Our purpose is simple: To shift the balance of power from the insurer to the policy holder[.]" (Wall Decl. Ex. 10.) Through Risk Worldwide, Keys pledged to help policyholders to recover their "missing billions." (Wall Decl. Ex. 11.) In Florida, Keys gave a presentation with a policyholder's lawyer to the Florida Association of Public Insurance Adjusters on how to "harvest the claim money" using the appraisal process. (Wall Decl. Ex. 12.)

### C. Keys Makes Millions of Dollars from Contingency Fee Contracts

Keys' bias in favor of policyholders is highly profitable. By regularly operating under rich contingency fee contracts, Keys is incentivized to exaggerate damages. American Family has obtained several examples of Keys' contingency fee contracts, which entitle Keys to as much as "30% of any additional insurance funds, contractual and extra contractual, received after the date of this agreement." (Wall Decl. Exs. 13.) Keys' advertisements feature a "partial list" of appraisal awards procured by Keys, detailing the "original offer" by the insurance company and

then the much larger "final award" obtained by Keys. (Wall Decl. Exs. 5 at 14, and 14.) The total difference between the "opening offer" and "final award" exceeds $113 million. At a 30% contingency fee, Keys would have earned $33.9 million from this "partial" list alone.

| Original Offer | Final Award |
| --- | --- |
| $253,675 | $2,751,487 |
| $20,722 | $1,275,000 |
| $172,526 | $906,981 |
| $250,000 | $8,313,673 |
| $39,004 | $1,494,000 |
| $0 | $1,875,000 |
| $37,000 | $1,117,000 |
| $42,278 | $112,475 |
| $52,863 | $572,033 |
| $0 | $3,815,339 |
| $155,000 | $1,050,273 |
| $551,858 | $2,778,538 |
| $276,972 | $3,108,307 |
| $260,490 | $6,561,115 |
| $3,554 | $700,604 |
| 30,000* | $191,915 |
| $172,879 | $3,215,942 |
| $366,403 | $1,588,324 |
| 20,000* | $192,104 |
| $0 | $437,859 |
| 180,000* | $4,156,380 |
| $2,000,000 | $22,913,938 |
| $858,489 | $11,630,208 |
| 200,000* | $4,341,062 |
| $456,140 | $5,600,365 |
| $613,225 | $1,952,734 |
| $27,384 | $2,264,462 |
| $49,726 | $1,788,415 |
| $0 | $950,000 |
| $1,200,000 | $23,069,120 |
| $183,601 | $1,970,195 |

(Wall Decl., Ex. 5 at 14.)

It is unknown at this stage of discovery the number of cases that Keys has assisted Merlin as a public adjuster, appraiser, or expert witness. However, American Family has compiled an incomplete list of cases in which Keys assisted Merlin attorneys, including Plaintiff's attorney, Christopher Mammel, prior to his joining of the Merlin firm. In total, Keys assisted Merlin and Mammel in at least 80 cases. (Wall Decl. Exs. 15 and 16.) As noted above, Merlin claims that Keys has assisted it on an "untold number" of cases, so the true number is likely in the hundreds. The close, undisclosed relationship, between Keys and Merlin has resulted in each being aggrandized to the tune of millions of dollars.

Keys and Merlin also improperly concealed Keys' contingency contracts. In the *Summit Park* case, for example, Merlin "took steps to conceal the existence of the contingent-cap fee agreement under which Keys was originally retained," and that Merlin's concealment of this agreement "support[s] a finding of bad faith on the part of Merlin." *Auto-Owners Insurance Co. v. Summit Park Townhome Assoc.*, 198 F. Supp. 3d 1239, 1244 (D. Colo. 2016). (*See also*, Wall Decl. Exs. 17-19.)[1]

### D.  Keys and Merlin Founded a Florida Lobbying Group to Advance Their Mutual Business Interests

Keys and Merlin have not only partnered together to obtain "untold millions," they have also advocated together for anti-insurer changes to the law to enrich themselves. In 1993, Chip Merlin, Grose, and others founded the Florida Association of Public Insurance Adjusters

---

[1] Keys' and Merlin's tactics have been exposed in other cases. In *Monaco Beach Club, Inc. v. QBE Ins. Corp.*, 06-2066CA (Collier Cty.), Keys and Mammel represented the policyholder. Keys' estimate was so inflated that a court called it "fraudulent," and the policyholder received nothing. (Wall Decl. Exs. 20-22.) Keys settled the subsequent malpractice action by paying the policyholder more than $600,000. (Wall Decl. Exs. 21 and 22.)

("FAPIA"), a group dedicated to advancing the interests of the policyholder's bar by, among other means, using their political action committee to advocate for pro-policyholder candidates and legislation. (Wall Decl. Ex. 23.) Keys' personal attorneys, Chip Merlin and Grose, were FAPIA's first legal counsel, and Keys was a founding member. (Wall Decl. Exs. 24 and 25.)

FAPIA's "number one goal is to protect policyholders and the public adjusting profession." (Wall Decl. Ex. 26.) FAPIA created a lobbying arm, Public Adjusters for the Insuring Public ("PA4IP"), which is designed to "further the legislative agenda of FAPIA." (*Id*.) Keys' company, Keys Claims, has contributed funds to PA4IP. (Wall Decl. Ex. 27.)

FAPIA's website looked like an advertisement for Merlin. The Merlin firm is a "Gold Sponsor" of FAPIA, and Merlin logos were ubiquitous on FAPIA's website. (Wall Decl. Ex. 28.) The FAPIA website has videos from Merlin attorneys advertising their law firm. (Wall Decl. Ex. 29.) FAPIA's YouTube channel also featured a video from Keys, who urges FAPIA members to stay united against insurance companies. (Wall Decl. Ex. 30*.*)

Keys is a two-time President of FAPIA. As President, Keys aggressively advocated for the policyholders' bar and against insurance companies. (Whipple Decl. Ex. 1; Wall Decl. Exs. 5, 6, 7, 27, and 30.) FAPIA's Facebook account features a photograph of Keys presenting a plaque to Chip Merlin as an award for his generous donations to Keys' organization.



(Wall Decl. Ex. 31.)

**E.    Norton Misrepresents Himself as "Local" to Gain Umpire Jobs**

Norton is not the competent and impartial umpire that Keys and Merlin represent him to be. Rather, Norton is a biased appraiser for policyholders and falsely poses as "local" to persuade courts to appoint him as an umpire. Norton, like Merlin and Keys, is from Florida and has expanded his practice around the country, including in Colorado. Norton was the umpire in *Summit Park*, and joined with Keys in signing an appraisal award of over $10 million, dwarfing even the public adjuster's inflated estimate. *Summit Park*, 2016 WL 1321507 at *5.

Norton resides in Plant City, Florida, but he claims that he has "offices" in Atlanta, Austin, Denver, Florida and New York. (Wall Decl. Ex. 32.) In fact, Norton's "offices" are nothing but mail boxes at various UPS stores around the country, which he maintains so that he can attempt to pass himself off as "local" to obtain umpire jobs wherever the opportunity arises. (Wall Decl. Ex. 33.) For example, when attempting to persuade a court to name him umpire in New York, Norton submitted a resume that listed a New York "address" that was actually a UPS box. Based on Norton's misrepresentation to the court, the court stated as follows:

> The court appoints Robert J. Norton, CPCU, AIC as umpire, largely based upon the location of his business, it[s] closeness to the subject property and the assumption that this closeness will give him a greater understanding of the loss in the context of the local area.

(Wall Decl. Ex. 34 (*Simat v. Tower Ins. Co. of N.Y.*, No. 14-008969 (N.Y. Sup. Ct. Nassau Cty. Nov. 25, 2014) and Ex. 35.)

Norton has made the same misrepresentation to the court in *Summit Park* and to Judge Taylor in *AXIS Surplus Insurance Company v. City Center West, LP*, 2015CV30453 (Weld Cty Dist. Ct.). (Wall Decl. Exs. 36-38.) In those cases, Norton listed his Colorado UPS box address on the resume submitted in support of his appointment as umpire. In *Summit Park*, the court stated during a hearing on September 25, 2015 that it was appointing Norton in part because "He is local[.]"(Wall Decl. Ex. 36 (Transcript 9:25-10:2).)

## F.     Merlin Appoints Norton Pursuant to Their "Umpire Shopping" Scheme

Merlin founder—William "Chip" Merlin—explicitly rejects the notion that appraisals should be carried out in good faith. Merlin advocates for "Umpire shopping" to game the appraisal process for Merlin's clients. The Merlin Law Blog published an article in which Chip Merlin stated that appraisals are an "anything goes" environment in which his law firm would

use any means short of "fraud" to "win," including "get[ting] into the mud with the best of anybody" and acting unfairly and in bad faith:

> If the rule is that there are no rules, I can get into the mud with the best of anybody. All I care about for my client is winning anyway I legally can if we go to an appraisal. Absent fraud, the Courts in informal situations have just about blessed that "anything goes."
>
> This is what I teach and preach to public adjusters that attend our workshops. Unlike an insurer to its customer**,** *I have no obligation to be fair and act in good faith to the insurance company during the appraisal process.*

(Wall Decl. Ex. 39, Merlin Law Blog, *Appraisers, Umpires and Appraisals as Valid Substitutions for the Right to a Jury Trial Depend on Viewpoint*, Aug. 8, 2009 at 5 (emphasis added).)

Such conduct includes what Merlin calls "Umpire shopping." Merlin's blog states that in the "real world" parties engage in "Umpire shopping" "everyday in the banter of the appraisal process." (*Id.* at 4.) In another article, Merlin lamented that "[m]any policyholder appraisers do not fully understand how to win the appraisal for the policyholder," as though the job of an impartial neutral were to "win" for one side. (Wall Decl. Ex. 40 at 3.) Merlin has specifically and publicly rejected the notion that appraisals should be fair: "Some may suggest that I am wrong, and that the goal of appraisal is a fair number for both sides." (*Id.*) In another article, Merlin stated regarding appraisal: "There is no second chance. *'Just win, baby'* is the mantra every policyholder better have in an appraisal." (Wall Decl. Ex 41.) Merlin continued: "My advice to policyholders: **WIN THE APPRAISAL ANY LEGAL WAY YOU CAN BECAUSE THERE IS LITTLE LIKELIHOOD OF OVERTURNING A BAD APPRAISAL AWARD**." (*Id.* (emphasis in original).)

Keys or Merlin frequently suggest Norton as an umpire, as American Family has obtained at least five examples in Colorado appraisals alone. (Wall Decl. Exs 36-38, and 42.) Additionally, Norton supports the Keys-Merlin lobbying group, FAPIA. A brochure for FAPIA's Florida golf tournament lists Norton as a sponsor and features a Norton alongside a Merlin logo:



(Wall Decl. Ex. 43.)

### G. Merlin-Keys-Norton Exposed in Colorado: Merlin Attorneys Sanctioned, Keys Disqualified, and Norton Appraisal Vacated

While the appraisal in this case was nearing its completion, another Merlin-Keys-Norton appraisal was falling apart. In *Summit Park*, the policyholder—a local condominium association—was represented by Merlin, and a dispute between the parties led to appraisal. 2016 WL 1321507 at *1. The insurer assessed the loss at approximately $368,361. The public adjuster, working on a contingency fee, then pegged the loss as exceeding $7 million. In the subsequent

appraisal, the policyholder appointed Keys as its purportedly "competent and impartial" appraiser. Merlin submitted the "Colorado" version of Norton's resume, and secured his appointment on that basis. (Wall Decl. Ex. 36, Transcript 9:25-10:2 (appointing Norton as umpire in part because "He is local"); and, Ex. 37.)

Prior to the appraisal, Auto-Owners Insurance Company ("Auto-Owners") requested that the parties make full disclosure of appraiser bias, including any relationship between any appraiser and counsel in the litigation, but Merlin did not do so. (Wall Decl. Ex. 44.) The court, however, confirmed that appraisers and umpires have a duty to disclose information relevant to their purported impartiality, including the existence of any relationship with counsel, and entered an order compelling such disclosures. (Wall Decl. Ex. 45.) In response, Keys and Merlin issued written disclosures stating that they had no relationship with each other than being retained by the same policyholders on different contracts. (Wall Decl. Ex. 46.)

Norton then issued an astonishing award of **over $10 million**, which was also signed, not surprisingly, by Keys. The appraiser appointed by Auto-Owners, however, refused to sign. (Wall Decl. Ex. 47.) Merlin, in turn, then attempted to parlay this staggering award into treble damages and fees under C.R.S. §§ 10-3-1115 and 1116.

In response to the award, Auto-Owners investigated Merlin, Keys, and Norton. This investigation eventually revealed that Merlin and Keys had a significant, multi-faceted and multi-decade public adjusting business relationship, which they had concealed from the court and from Auto-Owners. The court disqualified Keys on the grounds that he "cannot be considered impartial" due to his extensive relationship with Merlin, holding as follows:

> In addition to working on dozens of prior cases in which Keys was retained by the
> policyholder, Merlin and/or Merlin attorneys have served as Keys' personal

counsel, served as incorporator and registered agent for Keys' companies, taught with Keys, and donated to a Keys-led group involved in pro-policyholder lobbying. These aspects of the relationship between Keys and Merlin, viewed collectively, make clear that he cannot satisfy any of the standards of impartiality[.]

2016 WL 1321507 at *5. Beyond the Merlin/Keys relationship, Keys' policyholder bias demonstrated that Keys is not impartial: "While Keys' relationship with Merlin is sufficient by itself to render him other than impartial, the totality of the circumstances here make this conclusion unavoidable. As noted above, Keys has made numerous comments suggesting a bias in favor of policyholders." *Id.* The court found that Keys was not merely hypothetically partial due to his background, but rather, he had sought to maximize the award in that appraisal. Keys was initially retained in *Summit Park* on a contingent-cap contract, which provided him a personal financial interest in inflating the appraisal award. *Id.* Further, the Keys-Norton appraisal award in *Summit Park* far exceeded Summit Park's own public adjuster's estimate:

> [B]efore this lawsuit was filed, Summit Park's public adjuster estimated a replacement cost value of $7,140,117.82 for the damaged buildings, including replacement of undamaged vinyl siding to achieve matching. The corresponding figure in the appraisal award in which Keys participated, by contrast, is $10,870,090.96, an increase of $3.47 million, or 47%. Such a dramatic increase, coinciding with Keys' involvement in this case, confirms my doubts regarding his impartiality.

2016 WL 1321507 at *5.

The court vacated the appraisal award, imposed sanctions on the Merlin attorneys in that case, and dismissed the policyholder's claims. *See id.* at *7; *Summit Park*, 198 F. Supp. 3d at 1248. The court determined that the Merlin attorneys engaged in bad faith concealment of the Merlin-Keys relationship, explaining as follows:

> No reasonable attorney could have believed that the withheld information was not called for by my disclosure order . . . Pettinato's testimonial in Keys' brochure

> boasting of an "untold number of large multi-million dollar losses" that Keys and Merlin had jointly handled suggests that Pettinato had actual knowledge of the undisclosed facts but opted not to disclose them. And Harris' acknowledgment that Merlin assisted Keys with his disclosures dispels any doubt that Merlin played an active role in crafting the disclosures. These facts suggest a deliberateness with regard to Merlin's conduct that I find rises to bad faith.

198 F. Supp. 3d at 1244. Due to this improper concealment of the Merlin/Keys business relationship, the court dismissed the policyholder's claims as a sanction and awarded the insurance company attorney fees. *Id.* at 1247-48.

Judge Babcock was not the first Colorado court to disqualify Keys. In *AXIS* (attached to the Wall Decl. as Exhibit 48), the court found that Keys was incapable of being an "impartial" appraiser. Further, the court criticized Keys for concealing his extensive relationship with the policyholders' bar, holding:

> What is even more troubling is that Keys chose not to disclose this information . . . Instead of being aboveboard and demonstrating his neutrality, Keys' nondisclosure only raises suspicions about his impartiality and creates the appearance that he was trying to hide the extent of his relationship with [the policyholder's] lawyers.

*Id.*, op. at 2-3.

Subsequently, in *Church Mutual Insurance Co. v. Broadmoor Community Church*, No. 2015CV32454 (El Paso Cty. Dist. Ct., Colo. July 6, 2016) (attached to the Wall Decl. as Exhibit 49), the court stated the evidence "would cause any reasonable person to question [Keys'] impartiality." *Id.* at 1-3. The court criticized Keys' failure to disclose his relationship with the public adjuster in that case and disqualified Keys. *Id.* at 6.

Finally, *Great Northern Insurance Co. v. 100 Park Avenue Homeowners Assoc.*, No. 16-cv-2009 (D. Colo. Mar. 13, 2017) (attached to the Wall Decl. as Exhibit 50) featured a similar cast of characters as this case: like this case, the policyholder's public adjuster was Derek

O'Driscoll and Impact Claim Services, LLC, the policyholder's counsel was Mammel and

JoAnne M. Zboyan, and the policyholder's appraiser was Keys. Judge Matsch disqualified Keys,

ruling that he "is not an impartial appraiser." *Id.*, op. at 4.

At no point prior to or after the issuance of the appraisal award in *Copper Oaks* did Keys,

Merlin, or Norton disclose to American Family this onslaught of orders condemning the conduct

and non-disclosures of Keys and the Merlin lawyers.

## II.     THE CONDITION OF THE SUBJECT PROPERTY

Turning now to the appraisal at issue here, Keys and Norton secured an inflated award for

the Plaintiff, Copper Oaks Master Home Owners Association's ("Copper Oaks"). Copper Oaks

oversees an apartment complex consisting of 16 multifamily residential buildings and one pool

house. (Declaration of James Randall Whipple, P.E., S.E., MLSE ("Whipple Decl."), Ex. 4 at 2.)

The buildings were constructed in 1982-83 and have four exterior sides. (*Id.*, Ex. 12 at 2.) The

exterior elevations are lined with brick walls and horizontal wood plank siding, and the roofs are

constructed with asphalt composition shingles. (*Id.*, Ex. 4 at 2.) The buildings show significant

signs of aging and general deterioration. The roofs are up to 17 years old and show cracks from

age. (*Id.*, Ex. 4 at 6; Ex. 8 at 3.)



(*Id.*, Ex. 8 at 9.) The wood plank siding is shows signs of aging and deterioration.



(*Id.*, Ex. 8 at 11-12.) The brick at Copper Oaks is aged but in serviceable condition. The bricks

show minor chipping and deterioration on all four elevations. Brick deterioration is observed

uniformly throughout the property, including in brick directly under eaves or otherwise sheltered

from hail. The uniform distribution of chipping and deterioration indicates that the condition of the brick is due to general wear and tear, not hail. (*Id.* ¶¶ 22, 28; Ex. 8 at 4-5.)

## III.    COPPER OAKS' DEMAND FOR $3.5 MILLION

American Family issued to Copper Oaks policy number 05XZ662001 (the "Policy"), which provides coverage for direct physical loss to the property, excluding wear and tear, corrosion, deterioration, settling, and cracking in accordance with the full Policy terms and conditions. (Wall Declaration Ex. 51.) On April 23, 2014, Mark Richardson, the Copper Oaks Property Manager, filed a claim with American Family for purported hail damage. (Wall Decl., Ex. 52.) According to Mr. Richardson, a hail storm from more than seven months earlier, on September 9, 2013, caused damage to the property. (*Id.*)

American Family promptly launched an investigation into the alleged loss. American Family retained a local company to provide an estimate for roof replacement, and American Family also conducted its own inspection. (Whipple Decl. Ex. 4.) Despite the fact that the Copper Oaks roofs showed little hail damage, American Family agreed to pay for new roofing, as well as for paint, screens, air conditioning units, and other miscellaneous charges. In total, American Family agreed to pay for $620,979 in replacement cost value ("RCV") and promptly issued the appropriate actual cash value ("ACV") payment. (Wall Decl., Ex. 53.)

Copper Oaks hired public adjuster Derek O'Driscoll of Impact Claim Services, LLC ("Impact") on a contingency-fee contract that entitled Impact to 15% of all amounts paid by American Family. (Wall Decl., Ex. 54 (Impact Contract) at Copper Oaks-005367.) On or around December 9, 2014—almost five months after American Family issued its settlement check—

O'Driscoll sent American Family a demand for **$3,599,707.13** in replacement cost value. for

purported hail damage. (Whipple Decl., Ex. 5 at 1.)

American Family hired Madsen, Kneppers, & Associates ("MKA"), a firm providing

construction consulting services, to review O'Driscoll's estimate and to conduct an assessment

of the loss at Copper Oaks. (*Id.* ¶ 18 & Ex. 4.) On March 23, 2015, MKA provided their report to

American Family. MKA's independent estimate was $608,399 RCV, which is similar to

American Family's original estimate. (*Id.* ¶ 19 & Ex. 4 at 15.) In response, Copper Oaks invoked

the Policy's appraisal clause and commenced the present litigation. The Court subsequently

ordered the parties to appraisal. (ECF No. 40.)

## IV.     THE APPRAISAL

### A.     Copper Oaks Appoints Keys and Norton to the Appraisal Panel

The appraisal process began in early 2016. American Family appointed Mr. J.R.

Whipple, a Colorado engineer with Knott Laboratory, LLC ("Knott Laboratory"), as an impartial

appraiser. Whipple has several years of experience in investigating hail damage and designing

repairs to local residential and commercial facilities. (Whipple Decl. ¶¶ 5-14.)

Copper Oaks appointed Keys. Keys provided very limited written disclosures stating that

he was competent and impartial, and he attached a copy of his resume. (*Id.*, Ex. 1.) Keys then

proposed that Norton should be appointed umpire. (*Id.* ¶ 15.) Keys repeatedly assured Whipple

that Norton would be fair and impartial. As a result, Whipple agreed with Norton's appointment

as umpire. (*Id.*)

### B. Whipple Finds Minimal Damage at Copper Oaks

Whipple and his team of local engineers from Knott Laboratory conducted an in-depth and impartial examination of the Copper Oaks buildings. (*Id.* ¶ 21; Ex. 8.) Whipple identified areas of possible hail damage to roofing, siding, paint, and other building components, and included such damages in his estimate. (*Id.* ¶ 27.) Whipple's proposed appraisal award included paint and spot-repair of siding. (*Id.*, Ex. 9.) Similarly, he proposed spot repair of roofing, rather than complete replacement. (*Id.*) His appraisal did not include brick replacement, because the brick at Copper Oaks was not damaged by hail. (*Id.* ¶¶ 28-29.)

In an order to verify his conclusion that the brick was not damaged by hail, Whipple and his team conducted an on-site Hail Simulation Experiment. (*Id.* ¶ 28.) According to local, on-ground weather data, the maximum size of the hail that fell at Copper Oaks on September 9, 2013 was between 1/4 inch and 3/8 inch. (*Id.*, Ex. 4 at 4, Ex. 8 at 2.) Whipple manufactured one-inch ice balls to simulate hail, erring on the side of overestimating hail impact. (*Id.* ¶ 29, Ex. 8 at 4.) Whipple then calculated the most severe possible velocity, impact energy, and angle of the hailstones that fell at Copper Oaks. (*Id.*) The Hail Simulation Experiment used two impact angles: perpendicular to the surface for maximum energy transfer (worst case scenario for the brick, though not actually possible in reality) and 30 degrees (maximum realistic impact angle). (*Id.*) Multiple one-inch ice balls were launched at the test square of brick at these two angles. (*Id.*) Whipple examined the brick for damage following each launch. But in every test, the brick was completely undamaged. (*Id.*) Accordingly, Whipple ruled out the possibility that the brick at Copper Oaks was damaged by the September 9, 2013 hail storm. (*Id.* ¶¶ 28-29.) In sum, Whipple and his team concluded that there were limited areas of hail or wind damage that should be

remedied with appropriate repairs. (*Id.* ¶ 30.) Whipple concluded that the total RCV for the damage was $406,234.29. (*Id.* ¶ 32.)

### C. Keys Estimates an Astounding $5 Million in Damages

Keys also submitted a report to the other members of an appraisal panel. Keys recommended that <u>virtually every exterior surface</u> at Copper Oaks—regardless if it was damaged by hail—be completely demolished and rebuilt. Keys' first damage estimate came in at $4,968,115.62, which he subsequently increased to over $5 million. (Whipple Decl., Exs. 12-13.) In effect, Keys concluded that Copper Oaks' public adjuster, O'Driscoll, undervalued his client's claim by approximately **28%**, despite the fact that O'Driscoll was retained on a contingency fee and had strong financial incentive to inflate the estimate of loss.

Keys issued an estimate inflated beyond all reason. It included:

- **Brick Replacement**: **$90,556.09**. As noted above, brick replacement was unnecessary. Even assuming that the brick was damaged by hail, Keys did not call for repair or replacement of individual bricks as necessary, which is the standard industry protocol. Rather, Keys insisted that entire assemblies of undamaged brick be demolished and replaced. (*Id.* ¶ 40.)

- **Chimneys and Flues**: **$881,199.04**. Keys' purportedly "impartial" estimate included almost $1 million for complete replacement of fireplaces and flues, which were not damaged by hail. (*Id.* ¶ 42.)

- **Siding**: **$816,863.75**. Copper Oaks' horizontal wood plank siding suffered virtually no damage from the September 9, 2013 hail storm aside from stray paint chipping. Whereas American Family, MKA, and Whipple called for spot repair as needed and fresh paint, Keys' estimate included complete demolition and reconstruction of the siding on all four elevations, including elevations not exposed to hail. Keys' estimate also included costs for work that is ancillary to the full replacement of siding, such as detaching and resetting exterior lights, vents, and replacing water-resistant barriers behind the existing siding. (*Id.* ¶ 43.)

- **Roofing**: **$656,033.74**. Keys' estimate included total replacement of the roofs, which was not necessary. Even if roof replacement was necessary, Keys' estimate

for roof replacement far exceeded the local contractor estimates obtained by American Family. (*Id.* ¶ 39.)

**D.    Norton Hires EPI to Strike the Brick with a Steel Hammer**

Norton received conflicting reports from Whipple and Keys regarding the alleged damage at Copper Oaks, including purported damage to brick. Despite the fact that Norton had visited the property and reviewed reports from American Family, Impact, MKA, Keys, and a scientific experiment from Whipple, Norton claimed that he could not determine whether there was hail damage to the brick without more evidence. (Whipple Decl. ¶ 46.) Therefore, Norton hired an out-of-state company called Engineering Perspectives Inc. ("EPI") to conduct its own "experiment" to determine whether the September 9, 2013 hail storm damaged the brick at Copper Oaks. (*Id.*)

EPI's experiment consisted of striking the brick with hardened steel mandrel, called a "Schmidt hammer." (*Id.* ¶ 47.) EPI struck the brick with the Schmidt hammer with sufficient force to cause damage to the brick. Therefore, EPI concluded that the brick at Copper Oaks suffered hail damage. (*Id.* ¶ 47-48.)

Whipple explained to the appraisal panel that EPI's report was unscientific. While a Schmidt hammer can estimate a material's compressive strength, it cannot accurately determine hail damage. (*Id.* ¶ 49.) Hail is made of ice and hits siding at an angle, but EPI struck the brick with a hardened steel hammer at no angle, which maximizes the force that must be absorbed by the brick. (*Id.*)

Norton ignored Whipple's comments and sided with Keys' and EPI's baseless junk-science conclusion that hail damaged the brick. Accordingly, Norton "determined" that a

significant percentage of brick siding at Copper Oaks should be demolished and replaced. (*Id.* ¶¶ 50-51.)

### E. Norton Attempts to Coerce Whipple into Signing the Inflated Appraisal Award by Threatening to Increase the Award Even More

On July 11, 2016, Norton sent Keys and Whipple a letter with his proposed appraisal award of $3,084,362.77 RCV. (Whipple Decl. ¶¶ 50-51; Ex. 15.) Norton recommended widespread demolition and replacement of brick and wood siding despite any evidence indicating that those elements were damaged by the September 9, 2013 hail storm. (*Id.*) Norton's proposed award also included costs that were only necessary due to the replacement of siding, including the replacement of water-resistant barriers, detaching and resetting exterior light fixtures, and the replacement of vent covers.[2] (*Id.*)

Whipple refused to sign the inflated and unscientific appraisal award. In response, Norton threatened that if Whipple would refuse to sign, then Norton would inflate the award even more, writing: "your failure to [sign] will put me in a position that I do not wish to be that may require a <u>very significant shift upwards</u>" in the amount of the award. (*Id.* ¶ 55 (emphasis added); Ex. 18.)

Despite Norton's attempt to intimidate, Whipple maintained his refusal to sign the inflated award. Whipple criticized Norton's tactics, which he described as "an attempt to strong-arm this appraisal to a higher award." (*Id.* ¶ 57.) Further, Whipple explained that Norton's behavior was "not consistent with the spirit of the appraisal process or the court order." (*Id.*)

Norton followed through on his threat to "very significantly increase" the appraisal award, issuing a final award that contained an additional **$129,318.79** in phantom damages on

---

[2] On August 4, 2016, Norton circulated a slightly revised proposed award, which was reduced by $129,156 due to a calculation error related to roofing costs. (Whipple Decl. ¶ 54.)

top of the already inflated proposal that Norton had circulated only days earlier. (*Id.* ¶ 58.) As a result, the final award ("Appraisal Award") signed by Norton and Keys awarded exceeded $3 dollars RCV, far in excess of the actual damages to Copper Oaks. (*Id.* ¶ 58; Ex. 20.) American Family conditionally tendered a check for $2,265,024.85 and reserved its right to challenge the entire appraisal award. (*See* Pl.'s Mot. for Partial Summ. J., Ex. 4, ECF No. 52-4.)

## ARGUMENT

American Family has uncovered an attempt by Merlin—as Copper Oaks' representatives—to import its lucrative bad faith appraisal tactics from Florida into Colorado. In violation of the Policy's demand that each party appoint an "impartial" appraiser, Copper Oaks (through its counsel) selected Keys, a pro-policyholder activist with a multi-decade relationship with Merlin. Keys then concealed his biases and wildly lucrative relationship with Merlin, and secured Norton's appointment as umpire. After attempting to strong-arm Whipple into signing their proposed inflated award—which included millions of dollars in completely unnecessary repairs—Keys and Norton inflated their award even further. Any one of these facts would provide sufficient basis to vacate the award. Together, they leave no doubt that the appraisal award is the product of bias, incompetence, partiality, and multiple violations of Colorado law. It should be vacated.

## I.      AN APPRAISER'S DUTY OF IMPARTIALITY

### A.      Colorado Embraces High Standards of Appraiser Impartiality

While Merlin teaches that they "have no obligation to be fair and act in good faith to the insurance company during the appraisal process" and instruct their colleagues to "Just win, baby," that is far from the standard of impartiality and mutual good faith embraced in Colorado.

(Wall Decl. Exs. 39-41.) In Colorado, both the insurance company and the insured have a "corresponding duty of good faith and fair dealing." *Soicher v. State Farm Mut. Auto. Ins. Co.*, 351 P.3d 559, 565 (Colo. App. 2015). Accordingly, Colorado courts vacate awards issued by biased appraisers.

In Colorado, appraisal awards must be vacated if the award was procured in violation of the insurance policy or Colorado law. *See Providence Wash. Ins. Co. v. Gulinson*, 215 P. 154, 155 (Colo. 1923) (vacating appraisal award that had hallmarks of procedural unfairness); *St. Paul Fire & Marine Ins. Co. v. Walsenburg Land & Dev. Co.*, 278 P. 602, 602-03 (Colo. 1929) (same); *Summit Park*, 2016 WL 1321507 at *5 (vacating appraisal award due to partiality and Keys' and Merlin's violation of a court order); *Colo. Hosp. Servs. Inc. v. Owners Insurance Co.*, No. 14-CV-001859-RBJ, 2015 WL 4245821, at *2 (D. Colo. July 14, 2015) (vacating appraisal award due to one of the appraisers having a financial incentive to be partial).

Members of a Colorado appraisal panel must be competent and impartial, and courts must disqualify any member of a panel if they fail to meet these requirements. The Colorado Supreme Court has ruled that an appraiser in Colorado must be impartial in the same sense as a neutral referee. *Gulinson*, 215 P. at 155 ("Appraisers are not [arbitration] referees, but their duty of impartiality is the same[.]"). These referees, like arbitrators, must "exercise a high degree of impartiality, without the slightest degree of friendship or favor toward either party." *Noffsinger v. Thompson*, 54 P.2d 683, 683 (Colo. 1936) (citation omitted). *Couch on Insurance* advises that "[d]isinterest in the matter does not mean merely a lack of pecuniary interest, but is used in a broader sense, as impartial, fair, open-minded, and without partisanship, prejudice, or bias." 15 Couch on Ins. § 211:33. As the court in *Church Mutual* put it:

> In other words, the language calling for an impartial appraiser is simply not extraneous or meaningless language which the parties are free to ignore in the selection of their representative. The court cannot simply dilute the significance of the word "impartial" by cynically assuming the parties simply routinely ignore such language as they secretly select "ringers" for their side of the case in hiring an appraiser.

*Church Mut.*, op. at 5. The Policy in this matter likewise demands that appraisers must be "competent and impartial."(Wall Decl. Ex 51 at 38.)

If an award is signed by two members of the panel—as was the award here—and one of those appraisers is disqualified for bias, the appraisal must be vacated as a matter of law. This result is mandated the language of the Policy, which provides that an appraisal award is binding only if it is validly signed by at least two members of the panel. (*Id.*) *Summit Park*, 2016 WL 1321507, at *2 (vacating appraisal due to partiality of one of the signers of the award).

## B. *Dakota Station II* is Not Controlling

On July 27, 2017, a panel of the Colorado Court of Appeals released a 2-1 decision in *Owners Insurance Co. v. Dakota Station II Condo Association*, No. 16CA0733, 2017 WL 3184568 (Colo. App. July 27, 2017) which purported to establish a new standard for appraiser impartiality. The majority in *Dakota* held that appraisers "must act fairly, without bias, and in good faith [and] be free from suspicion or unknown interest," but may be an "advocate" for the party that selected them. 2017 WL 3184568 at *4 (citation omitted).

Concurring in part and dissenting in part, Judge Terry noted that Black's Law Dictionary defined "impartial" as "[n]ot favoring one side more than another; unbiased and disinterested; unswayed by personal interest." *Id.* at *10. Judge Terry also noted that the Colorado Supreme Court held that "[a]ppraisers are not referees, but their duty of impartiality is the same," which means that appraisers are "bound to exercise a high degree of impartiality, without the slightest

degree of friendship or favor toward either party." *Id.* (citations omitted). Accordingly, Judge Terry concluded that "the supreme court's standard of appraiser impartiality . . . is applicable here and consequently binds us," and appraisers must therefore be truly impartial, not "advocates." *Id.*

Dakota is <u>not</u> controlling here. This Court is not bound to follow this court of appeals decision; rather, this Court must follow the Colorado Supreme Court's decision in *Gulinson*, which held that appraisers are held to the same high standard of impartiality as arbitrators. *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1132 (10th Cir. 2002) (holding that decisions of courts of appeal should be disregarded if contrary to state supreme court authority).

Even if *Dakota* were controlling, the appraisal here must still be vacated under the rule articulated in that case. First, unlike in *Dakota*, the appraiser here concealed his past and current relationships with the policyholder's counsel. Second, in *Dakota*, the court found no affirmative misrepresentations by the appraiser, but here, Keys misrepresented that he was impartial. Third, in *Dakota*, the court found that the appraiser did not inflate the claim's cost above the insurer's estimate in an amount sufficient to show partiality. 2017 WL 3184568, at *9. Here, such claim inflation exists. Fourth, there were no allegations regarding the umpire in *Dakota*, but here, there are a host of issues with Norton. Finally, *Dakota* acknowledged that appraisers are bound to "act fairly, without bias, and in good faith [and] be free from suspicion or unknown interest." *Id.* at *4 (citation omitted). Here, Keys did not act fairly; he is admittedly biased; he operated in bad faith in this case by submitting a $5 million estimate; and he is hardly free from suspicion. The appraisal award must be vacated even under the *Dakota* standard.

## II.    AN APPRAISER'S DUTY TO DISCLOSE

Regardless of any specific disclosure order or discovery in individual cases, appraisers and umpires have a robust duty of disclosure rooted in Colorado law. The recent and comprehensive Report and Recommendation in *Church Mutual Insurance Co. v. Coutu*, No. 17-cv-209 (D. Colo. Sept. 13, 2017), recognized that appraisers and umpires must disclose facts regarding their impartiality under Colorado common law. (Wall Decl. Ex. 55.) Judge Wang's decision finds further support in industry standards, as described in expert Steven Plitt's declaration in this case. Mr. Plitt is the senior author of the current edition of the *Couch on Insurance* treatise. (Plitt Decl. ¶ 1.) In his declaration, Mr. Plitt notes that the court's analysis in *Coutu* mirrors industry standards, stating that appraiser impartiality is "a fundamental requirement of the policy" that must be given effect with robust disclosures. (*Id.* ¶ 9.)

Colorado's fraudulent concealment common law recognizes a duty to disclose all facts that which "in equity and good conscience should be disclosed." *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998) (citation omitted).

Colorado also looks to the Restatement (Second) of Torts § 551(2) for common law duties of disclosure. *Mallon Oil Co.*, 965 P.2d at 109. The Restatement calls for disclosure of "matters known [to a party] that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." Restatement (Second) Torts §551(2)(b). Also to be disclosed are facts basic to a transaction "if [a party] knows that the other is about to enter into it under a mistake as to them, and that the other, because of . . . the customs of the trade, or other objective circumstances, would reasonably expect a disclosure of those facts." *Id.* §551(2)(e). *See Coutu*, op. at 15-16.

These standards apply to appraisers, who are obligated to refrain from misleading.[3] In *Coutu*, Judge Wang held that a fraudulent concealment claim could be brought against an appraiser who allegedly "represented (through his actions or words) that both [the appraiser and umpire] were independent and impartial," when in fact, they were not. *Coutu*, op. at 17. Judge Wang held that an appraiser's "impartiality (or lack thereof) is a fact basic to the transaction, as it goes to the essence of the appraisal process." *Id. Coutu* also cited Judge Babcock's holding in *Summit Park* finding "that an appraiser has a duty to disclose facts that a reasonable person would consider likely to affect his or her impartiality," including any relationship between appraiser and a party's counsel. *Id.* at 19-20 (citing *Summit Park*, 2016 WL 1321507 at *1).

The implied covenant of good faith and fair dealing in every Colorado insurance policy requires the same level of disclosure. (Plitt Decl. ¶ 7.) This implied covenant provides that "neither party should act to impair the right of the other to receive the benefits of the contract." (*Id.* (citing *Abdelsamed v. New York Life Ins. Co.*, 857 P.2d 421, 429 (Colo. App. 1992), *rev'd on other grounds*).) Appraiser impartiality is "a fundamental requirement of the policy" which must be given effect with robust disclosures. (Plitt Decl. ¶ 9.) According to Mr. Plitt, "[f]ull and complete disclosure is key to establishing that an appraiser is free from suspicion or unknown interest." (*Id.* ¶. 14.) Accordingly, Colorado law "requires full and reasonable disclosure of any possible relationships which could give rise to preconceived partiality in favor of one of the parties or bias." (*Id.* ¶ 10.)

---

[3] Likewise, in the arbitration context, a substantial business relationship between an arbitrator and lawyers in a party's law firm must be disclosed. *Nasca v. State Farm Mut. Automobile Ins. Co.*, 12 P.3d 346, 350 (Colo. App. 2000).

## III.  THE APPRAISAL AWARD MUST BE VACATED

The application of facts to law in this case is straightforward. Appraisal awards must be vacated if obtained in violation of the Policy or Colorado law, which demand appraiser competence and impartiality and robust disclosures regarding the same. Keys and Norton are not competent and impartial under any reasonable conception of the term. Keys has dedicated his professional life to maximizing returns for policyholders, and Norton is a product of Merlin's "umpire shopping" tactics and has made numerous misrepresentations to courts in order to obtain umpire appointments. Keys' and Norton's tactics in this case prove their partiality. Here, Keys continued his failure to make the required disclosures under Colorado law. Keys "disclosed" that he was competent and impartial, but failed to disclose that *four* Colorado courts have held otherwise, nor did Keys disclose his multi-decade relationship with Copper Oaks' counsel, Merlin. Likewise, Norton's tactics in this case—which include disregarding the science and threatening Whipple—prove that he is not competent and impartial.

Keys' and Norton's failures to disclose and partiality are more than sufficient to vacate the appraisal award in this matter, but even if they were not, the underlying substance of the award certainly is. This award is inflated by millions. It includes costs for brick replacement where there was no brick damage. It includes costs for full demolition and replacement of wood plank siding—a completely unnecessary repair. Perhaps most egregious, it includes over $100,000 in additional inflation just because Whipple refused to sign the award.

The evidence in this case—supported by the declarations of a local, impartial engineer, and a renowned scholar and author of Couch on Insurance—demonstrates that this appraisal

award is the product of partiality, non-disclosure, bad science, coercion, and that it has no legitimate basis at all. It must be vacated.

### A. Keys Is Not Competent and Impartial

Based on the factual record in this case, Keys cannot be considered a competent and impartial appraiser with respect to Merlin clients:

Attorney-Client Relationship. Keys is a longtime client of Merlin, with multiple engagements as far back as 1995. As recently as 2010, Merlin served as the registered agent for Keys' company. As explained by Mr. Plitt, this arrangement is likely a sort of symbiotic business relationship in which a public adjuster, like Keys, refers potential bad faith claims to a law firm, like Merlin. (Plitt Decl. ¶ 19(a)(2).) In return, Merlin may provide free legal services to Keys as a form of client development. Regardless, these sorts of fiduciary arrangements and duties of loyalty are the opposite of "impartiality."

"Untold" Millions for Merlin and Keys. Merlin boasts that Keys has helped recover for Merlin clients (and hence Merlin operating on contingency fees) "untold number of large multi-million dollar losses to an amicable resolution and settlement to the policyholders' benefit and satisfaction." (Wall Decl. Ex. 5 at 5.) Without the benefit of discovery, American Family has identified **80 cases** in which Keys has assisted Merlin attorneys. Merlin is well aware that Keys is not "impartial" – Merlin frequently appoints Keys as appraiser because Merlin *knows* that Keys is dedicated solely to policyholders and will maximize the appraisal award.

The Keys/Merlin Lobbying Relationship. As a two-time President of FAPIA, Keys fought against insurance companies and for public adjusters. FAPIA Presidents would not be

expected to be "impartial." Additionally, Merlin was a generous donor to Keys' organization, which earned Chip Merlin a plaque presented to him by Keys.

<u>Keys' Promise to Maximize Payouts to Policyholders</u>. Keys boasts of his abilities to maximize financial returns to policyholders, and features in his advertising a chart depicting—as of that time—over **$113 million** in additional monies he recovered for policyholders. (Wall Decl. Ex. 5 at 14.) Likewise, Merlin boasts on its blog that Keys is solely devoted to policyholders. (Wall Decl. Ex. 7.) In another case, Keys explicitly rejected the idea that he should be "free from bias or ill motives," and he freely admitted to acting "somewhat biased" in appraisals. (Wall Decl. Ex. 8.) The Court need not speculate as to whether Keys is partial: Keys *guarantees* that he is partial.

These facts have now led four Colorado courts to disqualify Keys for partiality. Judge Babcock reviewed the voluminous evidence of Keys' partiality and concluded that "the relationship between Keys and Merlin, viewed collectively, make clear that he cannot satisfy any of the standards of impartiality[.]" *Summit Park*, 2016 WL 1321507, at *5. *See also Great Northern*, op. at 4; *AXIS*, op. at 5-6; *Church Mut.*, op. at 6. (Wall Decl. Exs. 48-50.)

Keys' partiality is demonstrated by his prior, wildly excessive, claim inflation in Colorado as well. In *Summit Park*, Judge Babcock noted that Summit Park's public adjuster—who was paid on a contingency fee—estimated damages at approximately $7.1 million; but the appraisal award signed by Keys and Norton exceeded $10.8 million, a 47% increase. 2016 WL 1321507, at *5. Judge Babcock held that "[s]uch a dramatic increase, coinciding with Keys' involvement in this case, confirms my doubts regarding his impartiality." *Id.*

Mr. Plitt explains that it "is rare to the point of being practically unheard of" for an appraiser to estimate damages significantly higher than the public adjuster. (Plitt Decl. ¶ 21.) But in this case, Keys' estimate was almost $1.5 million greater than Copper Oaks' contingency-fee based public adjuster had estimated. (*Id.* ¶ 22.) While Keys' estimate in *Summit Park* was unusual, his subsequent inflated estimate in the present case leaves no doubt that he is partial:

> I concur with Judge Babcock's observation in the *Auto-Owners-Summit Park* case that the coincidence of such a massive increase in estimated damage value from the estimated damage value proffered by the public adjuster after Mr. Keys got involved demonstrates lack of impartiality. As previously stated, for there to be any significant increase differential between the estimate for repair of the public adjuster and the public adjuster's selected appraiser is so rare that it is likened to lightning striking. However, the likelihood that lightning would strike <u>twice</u> in Colorado cases, coinciding with Mr. Keys' involvement, defies any explanation other than that the differential is the product of bias and partiality[.]

(*Id.* ¶ 24.)

Whether framed in terms of bias, preference, or favoritism, the evidence of Keys' partiality is overwhelming. Copper Oaks did not appoint an "impartial" appraiser, as the Policy and Colorado law requires. Copper Oaks appointed a committed policyholder activist who has a decades-long relationship with Copper Oaks' counsel and promises to be biased in his appraisals.

## B. Keys Failed to Make Disclosures Required by Colorado Law

In Keys' disclosures, he affirmatively represented that he was "competent and impartial." (Whipple Decl. Ex. 1.) As noted above, Keys' statement was not true. Also, Keys failed to disclose:

- His attorney-client, incorporator, and agency relationships with Merlin attorneys;

- His 80 retentions on Merlin-Mammel cases—presumably resulting in tens if not hundreds of millions going to both Keys and Merlin;

- That Merlin was the top donor to FAPIA while Keys was President;

- That four Colorado courts had recently held that Keys was partial; and

- Merlin attorneys had written glowing profiles of Keys and had provided testimonials for Keys' advertisements.

Keys' failure to disclose these material facts is disqualifying. As the court recently ruled, an appraiser's "impartiality (or lack thereof) is a fact basic to the transaction, as it goes to the essence of the appraisal process." *Coutu*, op. at 18; (Plitt Decl. ¶ 10.) Whipple confirms that the withheld information was material; Whipple states that had he known about Norton's history and Keys' relationship with Merlin, he would have demanded greater disclosures from Keys and refused to appoint Norton. (Whipple Decl. ¶¶ 16-17.) Since Colorado common law requires disclosure of "that which in equity and good conscience should be disclosed," Keys has—again—violated his disclosure obligations in a Colorado appraisal. *Mallon Oil*, 965 P.2d at 111.

Multiple Colorado courts have criticized Keys' failure to disclose. Judge Taylor noted that Keys' failure to disclose in the *AXIS* case "only raises suspicions about his impartiality and creates the appearance that he was trying to hide the extent of his relationship with [the policyholder's] lawyers." *AXIS*, op. at 2-3. Judge Babcock echoed these concerns and held that the circumstances of nondisclosure in *Summit Park* "suggest[s] a deliberateness . . .that I find rises to bad faith." 198 F. Supp. 3d at 1244. Keys is at it again here. Mr. Plitt notes: "Even after being sanctioned for not disclosing the bias and partiality of Mr. Keys by the U.S. District Court in Colorado, the insured, public adjuster, and Merlin Law Group made a conscious decision not to disclose this information to American Family prior to the entry of the appraisal award in this case." (Plitt Decl. ¶ 16.)  Such conduct can certainly be described not only as deceitful, but as brazen, unrepentant and incorrigible.

In sum, Keys and Merlin were aware of their ongoing disclosure obligations, but chose to disregard them. This Court should join Judges Babcock and Taylor and hold that Keys' failure to disclose demonstrates that he is unfit to serve as an "impartial" appraiser in this matter.

### C. Norton Is Not Competent and Impartial

The number of appraisals that Norton has worked on with Keys or Merlin is unknown. What is known is that Norton was appointed as umpire in *Summit Park* and the present case at Merlin's and Keys' urging. The policyholder in *AXIS* also appointed Keys as its appraiser and submitted a motion to appoint Norton as umpire. (Wall Decl. Exs. 36-38.) Additionally, in *American Family Mutual Insurance Company v. Gallery at the Ranch Condominium Association*, 2015CV31541 (Adams Cty.), the policyholder, represented by Merlin, appointed Keys as its appraiser and requested that the court appoint Norton. (Wall Decl. Ex. 42.)

Merlin admits that it does not approach appraisals in good faith and that it engages in "umpire shopping" in order to "win the appraisal" and obtain the highest appraisal award possible. (Wall Decl. Exs. 39-41.) Merlin and Keys repeatedly recommend Norton, and he faithfully delivers to Keys and Merlin inflated appraisal awards. And Norton appears happy to repay Merlin and Keys for their support by sponsoring FAPIA. (Wall Decl. Ex. 43.)

Norton's repeated misrepresentations of his residence indicate that Norton is willing to mislead courts in order to obtain umpire jobs. As noted above, Norton maintains UPS mail boxes around the country—which he refers to as "offices"—in order to persuade courts that he is "local," in close proximity to the loss. (Wall Decl. Exs. 33.) Accordingly, Norton cannot be considered competent and impartial. *Noffsinger*, 54 P.2d at 683; *Gulinson*, 215 P. at 155. *Dakota*'s holding that appraisers must "be free from suspicion or unknown interest" disqualifies

Norton as well. 2017 WL 3184568 at *4. While the full extent of Norton's involvement in the Merlin-Keys public adjusting scheme remains unknown, the evidence gathered so far proves that Norton concealed his business relationship with Merlin and Keys and routinely engages in dishonest conduct to obtain umpire appointments. Further, as explained below, any doubt as to Norton's partiality is settled by Norton's egregious misconduct during the appraisal in this case.

**D.      The Copper Oaks Appraisal is the Product of Partiality and Incompetence**

Keys' and Norton's non-disclosures and partiality corrupted the appraisal process here. First, the appraisal award was possible only because Keys and Norton were appointed to the panel. Had proper disclosures been made, Keys would have been disqualified and Norton would not have been appointed. (Whipple Decl. ¶ 16.) It was only through Keys' and Norton's concealment of material facts that the panel was constituted in the first place. Where an award is tainted by such non-disclosures and partiality, it should be vacated. *Summit Park*, 2016 WL 1321507, at *5.

Second, Keys' $5 million proposed award was absurdly inflated and not based on objective evidence, as it included millions of dollars in unnecessary costs, such as replacement of undamaged brick, chimneys, flues, and siding. Judge Babcock and Mr. Plitt agree that even proposing such an award confirms that Keys is partial. *Summit Park*, 2016 WL 1321507, at *5; (Plitt Decl. ¶ 24.)

Third, Norton's commissioning of and subsequent reliance on the EPI hail "experiment" further demonstrates that Norton is not competent and impartial. Whipple proved that the September 9, 2013 hail storm could not have damaged the brick at Copper Oaks for two primary reasons: (i) the brick throughout the property was uniformly "chipped," including brick tucked

away under eaves where it was not exposed to hail. Hail is directional, meaning that it typically only damages one or two sides of a building, and cannot cause damage to brick protected by eaves. Here, the alleged hail damage was uniformly distributed to all sides and under eaves. The "damage," therefore, is consistent with rough handling during construction or long-term wear and tear, neither of which is covered under the Policy. (Whipple Decl. ¶ 29.) (ii) Whipple's Hail Simulation Experiment replicated the September 9, 2013 hail storm, yet could not produce any damage to the brick at Copper Oaks. Even when Whipple increased the power of the hail strikes beyond what the hail storm could have produced, it caused no brick damage. (*Id.*)

Norton, however, ignored *all* of this evidence in favor of EPI's experiment, which involved striking the brick with a steel hammer. (Whipple Decl. ¶ 47.) Keys and Norton embraced this bad science and awarded costs for imaginary damages.

Fourth, Norton's threat to increase the award if Whipple did not sign it is beyond the pale. Norton issued his threat on August 4, 2016, a few months <u>after</u> the Keys-Norton appraisal in *Summit Park* was vacated, and only three days after Judge Babcock imposed severe sanctions on two Merlin attorneys. *See Summit Park*, 198 F. Supp. 3d 1247-48. *Summit Park* made it necessary for Norton to coerce an agreement from Whipple. Norton needed Whipple's signature on the appraisal award as a guarantee to preserve the award in the event that Keys would be disqualified again. (Plitt Decl. ¶ 31.)

According to Whipple and Mr. Plitt, Norton's threat was unprecedented. Whipple describes Norton's email as "shocking," "an unprecedented strong-arm tactic," and something he had never before encountered. (Whipple Decl. ¶ 56.) According to Mr. Plitt: "In essence, Mr. Norton was threatening Mr. Whipple. Mr. Norton wanted a unanimous award and the penalty for

not agreeing with Mr. Norton was going to be a higher award as retribution against Mr. Whipple and American Family . . . I have never seen an umpire act in the manner that Mr. Norton did in this case[.]" (Plitt Decl. ¶¶ 30-31.)

When Whipple refused to sign the award regardless of Norton's coercion, Norton followed through on his threat and retaliated by adding $129,318.79 to the already inflated proposed award. Such conduct demonstrates Norton's lack of competence and his partiality. Further, Norton's conduct is far worse than the procedural irregularities that led the Colorado Supreme Court to vacate the appraisal award in *Gulinson*. 215 P. at 155 (vacating appraisal award where two appraisers signed the award in the absence of the third). Accordingly, Norton's coercion of Whipple and subsequent inflation of the appraisal award was improper, and the appraisal award must be vacated on that basis as well.

## **CONCLUSION**

For the reasons stated above, American Family requests that the Court enter an order (i) disqualifying Mr. George Keys from acting as appraiser in this matter; (ii) disqualifying Mr. Robert Norton from acting as umpire in this matter; (iii) finding that Copper Oaks, acting through Merlin, violated the Policy's appraisal provision and Colorado law by appointing Keys as an appraiser; (iv) vacating the August 8, 2016 appraisal award (ECF 43); (v) granting American Family leave to file a motion for sanctions based on the conduct described above and Copper Oaks', Keys', and Norton's misconduct; and (vi) providing for such other relief, including discovery, as the Court deems proper.

Dated:  October 22, 2017                              Respectfully submitted,


*s/ Terence M. Ridley*
Terence M. Ridley
Evan Bennett Stephenson
Cedric D. Logan
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202-5647
Telephone:  303.244.1800
Facsimile:  303.244.1879
Email:   ridley@wtotrial.com
          stephenson@wtotrial.com
          logan@wtotrial.com

Attorneys for Defendant American Family
Mutual Insurance Company

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on October 22, 2017, I electronically filed the foregoing **DEFENDANT'S MOTION TO VACATE APPRAISAL AWARD** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Kirstin Michelle Dvorchak**
  kdvorchak@cla-law.net, lmaloney@cla-law.net, kdvorcha@gmail.com, scurtin@cla-law.net, mkuenzler@cla-law.net, mfrancis@cla-law.net

- **Edward Eshoo, Jr**
  eeshoo@merlinlawgroup.com, ileservice@merlinlawgroup.com

- **Clifton J. Latiolais, Jr**
  clatiolais@cla-law.net, lmaloney@cla-law.net, mrobinson-sanders@cla-law.net, mkuenzler@cla-law.net, mrobinson@cla-law.net, mfrancis@cla.law.net

- **Cedric Dwight Logan**
  logan@wtotrial.com, lorubbio@wtotrial.com

- **Christopher N. Mammel**
  cmammel@merlinlawgroup.com, tchensee@merlinlawgroup.com

- **Terence M. Ridley**
  ridley@wtotrial.com, wall@wtotrial.com, norris@wtotrial.com

- **Evan Bennett Stephenson**
  stephenson@wtotrial.com, cljones@wtotrial.com

- **JoAnne M. Zboyan**
  jzboyan@springersteinberg.com, law@springersteinberg.com, cmauracher@springersteinberg.com

*s/ Terence M. Ridley*
Terence M. Ridley
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202-5647
Telephone:  303.244.1800
Facsimile:  303.244.1879
Email:  ridley@wtotrial.com
Attorney for Defendant American Family Mutual
Insurance Company