**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 15-cv-01828-MSK-MJW

**COPPER OAKS MASTER HOME OWNERS ASSOCIATION, a Colorado corporation,**

   **Plaintiff,**

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a corporation,**

   **Defendant.**

---

**OPINION AND ORDER VACATING APPRAISAL AWARD**

---

   **THIS MATTER** comes before the Court on Defendant American Family Mutual Insurance Company's ("American Family") Renewed Motion to Vacate Appraisal Award.  The Court has considered the parties' briefing on that issue (**#119** and **#120**)[1] as well as the evidence and argument presented at an evidentiary hearing.  The Court finds and concludes as set forth below.

## I.   JURISDICTION

   The Court generally exercises jurisdiction pursuant to 28 U.S.C. §1332.  Although the Court has unresolved concerns about its subject matter jurisdiction for some claims in this case, it addresses the pending motion exercising its inherent powers to enforce orders of the court.  *See Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 886 F.3d 863, 867-68 (10th Cir. 2018)

---

   [1] Such numerical references are to entries in the official docket in this matter.

## II.     ISSUE PRESENTED

Copper Oaks Master Home Owners Association ("Copper Oaks") is the manager of sixteen residential buildings and a pool house located in Lakewood, Colorado.  It was the insured on a casualty insurance policy issued by American Family (the "Policy").  As discussed in more detail herein, a salient feature of the Policy is the requirement that, when the value of a claim is disputed, the parties must engage in an "appraisal" process to quantify the value of the loss.

Copper Oaks alleges that in September 2013, a hail storm caused significant damage to the property, and it made a claim upon American Family for coverage under the Policy. Ultimately unhappy with the amount that American Family initially paid on the claim, Copper Oaks filed suit in state court.  American Family removed the case to this Court.  The Amended Complaint in this action states four claims: 1) a request for declaratory judgment as to the appraisal process and award; 2) a request to compel an appraisal award in accordance with process specified in the Policy; 3) breach of contract in failing to pay the amounts owed under the Policy; and 4) unreasonable delay in payment in violation of C.R.S. 10-3-1115 and 1116 (**#96**).

Early in the case Copper Oaks requested, and the Magistrate Judge ordered, that the parties participate in the appraisal process specified by the Policy.  That process requires each party to appoint a "competent and impartial" appraiser.  The two appraisers then jointly select a neutral umpire.  Each appraiser submits an opinion as to the amount of the loss to the umpire. Upon the agreement of the umpire and at least one of the appraisers, the amount of the loss is conclusively determined.

The appraisal process occurred in this case throughout most of 2016, but in January 2017, the parties announced that they had a dispute over the validity of the appraisal award (**#43**).

Thereafter, Copper Oaks filed a motion for Partial Summary Judgment (**#52**), seeking to enforce the appraisal award.  American Family responded with a Motion to Vacate Appraisal Award (**#80**).

Upon review of the record, the Court became concerned about the sufficiency of Copper Oaks' standing to bring the first three claims.  The Court issued an Order to Show Cause as to why those claims should not be dismissed (**#82**).  At a hearing on the issues, and after consideration of the parties' arguments, both oral and written, the Court: 1) bifurcated claims in the Complaint into two groups – claims the concerned the appraisal process (Claims 1 and 2), and claims that concerned breach of contract and statutory bad faith breach of contract (Claims 3 and 4) (**#94**).   After denying the parties' respective dispositive motions, the Court set the matter for a Pretrial Conference (**#111, 118**).

At the conference, the parties agreed that there was a dispute as to whether the appraisal award was valid.  American Family orally renewed its Motion to Vacate the Appraisal Award, which essentially sought judgment on Copper Oaks' first and second claims for relief.  American Family contended that the appraisal award should be invalidated because the appraiser selected by Copper Oaks, Mr. George Keys, and the umpire,  Mr. Robert Norton, were not impartial. Copper Oaks responded that American Family i) waived any objection to Mr. Keys and Mr. Norton, ii) is estopped from challenging them now, and iii) its request is barred by the doctrine of laches.

Upon consent of the parties, the sufficiency of the appraisal was tried in a multi-day bench trial.  At the close of the trial, the Court announced its intent to grant American Family's Motion to Vacate the Appraisal Award, stating that a written opinion would be issued.  This opinion follows.

## III. FINDINGS OF FACT

Having considered the stipulations of fact, the evidence presented, both documentary and by testimony, and having observed the witnesses' manner in testifying, recollection, consistency and all other matters in assessing the credibility of such testimony, the Court finds as follows.

**Background**

1.  Copper Oaks is a 30 year-old condominium, townhome and apartment complex located in Lakewood, Colorado.  It is comprised of 16 multi-family buildings and a pool house. Copper Oaks has a homeowner's association administered by a Board of Directors ("the Board"). For most of the time pertinent to this case, the Board retained 4 Seasons Management & Realty Group ("4 Seasons") to manage the property.  4 Seasons assigned this responsibility to Mark Richardson.

2. On September 9, 2013, Copper Oaks was subject to an afternoon thunderstorm.  The parties disagree as to whether the complex was hit by hail during the storm, and if so, the size of the hail.

3.  At the time of the storm, Copper Oaks was insured under the  Policy issued by American Family.

4.  Immediately following the storm, Mr.Richardson saw leaves and debris scattered about the  complex.  He contacted Derek O' Driscoll of Impact Claim Services, LLC, requesting that Mr. O'Driscoll conduct a free inspection of the building roofs.  At the Board meeting in November 2013, Mr. O'Driscoll discussed his roofing evaluations and offered to represent Copper Oaks as public adjuster on its anticipated claim to American Family.

5.  In December 2013, a report commissioned by Mr. Richardson showed that Copper Oaks was severely undercapitalized given the size, age and condition of the complex.  The

homeowners association had reserves of only $70,112, which was 11% of that recommended ($625,597) in order to address extensive needs for building maintenance and repair.  The report advised the association to impose a special assessment of $1,500 per unit in order to maintain necessary reserves.  There is no evidence that the association did so.

6.  In March 2014, the Board hired Mr. O'Driscoll and his company, Impact Claims, LLC, as its public adjuster for the purposes of investigating and processing a claim for hail damage.  The Board agreed to pay Mr. O'Driscoll/Impact Claims, LLC a contingent fee of 15% of any insurance award.

7.  In late April 2014, Mr. Richardson notified American Family of Copper Oaks' loss. American Family promptly inspected the property and estimated the damage to be $620,979 at replacement cost value ("RCV").  In July 2014, American Family issued a check to Copper Oaks in the amount of $497,765.43, which reflected Actual Cash Value ("ACV") of the loss – the RCV less depreciation and deductible.

8.  Later that year, Mr. O'Driscoll opined that the Copper Oak's loss was substantially more than American Family had paid – $3,599,707.13. Mr. O'Driscoll urged the Board to supplement its claim.  The Board agreed, and retained 4 Seasons to provide management support services during the anticipated repairs for a contingent fee of 2.5% of any insurance award.  Mr. O'Driscoll advised the Board that this fee could be built into the ultimate claim award.

9.  When advised of Mr. O'Driscoll's estimate of Copper Oak's loss, American Family retained Madsen, Kneppers & Associates ("MKA") to appraise the loss.  The firm inspected the property and issued a report estimating the total RCV loss at $608,398.49.

10.  The parties were unable to resolve disagreements as to the amount of the loss, and this action was filed on July 25, 2014.

### Requirements for the Appraisal Process

11. The Policy sets out the appraisal process to be used in the event that the parties cannot agree on the amount of a loss.

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. **In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire.** If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. **The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.**

(Emphasis added.) The Policy contains no definition of "competent" or "impartial."

12. In January 2015, Magistrate Judge Watanabe granted (**#40**) Copper Oaks' Motion for Order Enforcing Appraisal Under the Insurance Policy. His order states in pertinent part:

> [T]he court finds that Judge Babcock's reasoning in *Auto-Owners Ins. Co. v. Summit Park Townhome Assn.*, 2015 WL 1740818 (D. Colo. April 14, 2015)[2], should be followed in the case. The record presented in the moving papers and the language used in the applicable policy provisions as cited by the parties support this court's analysis that this court should instruct the appraisers to determine the "amount of the loss" caused by hail or wind as required under the applicable policy provisions. By doing so, the appraisers will necessarily exclude loss or damage caused solely by a cause other than hail or wind.

13. Copper Oaks selected George Keys and his company, Keys Claims Consultants, Inc. ("KCC") to act as its appraiser. American Family selected James R. Whipple. Mr. Whipple and Mr. Keys then selected Mr. Norton as the umpire. Mr. Keys proposed that the parties abide by the terms of DORA Bulletin B-5.26, published by the Colorado Department of Regulatory

---

[2] In *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, No. 14-cv-03417-LTB, 2015 WL 1740818 (D. Colo. April 14, 2015), the terms of the insurance policy were identical to those in this matter. The order referenced provided that the appraisal award should include the cost of removing undamaged property to achieve matching and other disputed costs with sufficient detail to enable the Court to include or exclude them once a determination of coverage was made.

Affairs, Division of Insurance ("the DORA Bulletin").  All parties agreed that the standards set forth in the DORA Bulletin would govern their conduct during the appraisal.

14.  Pertinent to this case, the DORA Bulletin requires that the appraisers to be "fair and competent."  The DORA Bulletin prohibits an appraiser from having a financial interest in the outcome of the appraisal, and imposes on the appraiser a continuing duty to disclose any facts, known or learned after accepting appointment, that a reasonable person would consider likely to affect the appraiser's interest in the amounts determined by the appraisal process.  The DORA Bulletin also requires that an umpire be "fair, competent and impartial."  To this end, the Bulletin requires the umpire to "remain neutral" and prohibits the umpire from having "any communication with an appraiser" without participation by both parties and/or their representatives.

**Keys' Fee Arrangement with Copper Oaks**

15.  At the April 2015 Board meeting, Mr. O'Driscoll introduced and endorsed Mr. Keys and KCC (collectively, "Keys"[3]).  Keys' presentation and literature espoused views favorable to insurance policyholders and touted success based upon Mr. Keys' prior experience as an insurance adjuster, which gave him "the edge" in getting the highest claim awards for his clients. He advertised that he treated his clients "like he was dealing with his momma."  Mr. Keys and Mr. O'Driscoll also recommended that the Board retain the law firm of Becker & Poliakoff, P.A,

---

[3]  Although there may be a legal distinction between Mr. Keys and KCC, the parties refer to them interchangeably throughout the evidentiary record, and there is no evidence that suggests any formal observance of a legal distinction between them.  The Court will therefore refer to them collectively as Keys.

in which Christopher Mammel, Copper Oaks' current counsel, was a principal.[4]  Ultimately, the Board adopted both recommendations.

16.  At the June 2015 Board meeting, Mr. O'Driscoll explained Keys' Appraisal and Consultant Agreement (Ex. 13).  The agreement required Copper Oaks to pay a fee calculated at "$350.00 per hour plus expenses, not to exceed 10% of the total of the insurance funds received."  It contained no terms specifying what services would be provided, who would perform the services, or any hourly rate other than $350.  There was no provision for periodic billing or review of charges incurred.  Indeed, only paragraph 5 addressed payment, specifying that KCC would be "paid as a joint payee by the insurance company."

17.  There is no signed copy of the Appraisal and Consultant Agreement in the trial record, but Board minutes from June 8, 2015 reflect its approval and  the retention of both Keys and Becker & Poliakoff (Ex. 8).

18.  In the ensuing months, several judicial opinions in unrelated cases involving the same Policy language i) found that Mr. Keys was not sufficiently "impartial," ii) disqualified him as an appraiser, and iii) vacated appraisal awards where he had been an appraiser.  One specifically cited to the percentage fee cap in Keys' fee agreements as evidence of bias.  In light of this particular decision, Keys sought to renegotiate his Appraisal and Consultant Agreement with Copper Oaks.  The Board's September 2015 meeting minutes describe a seventy minute executive session in which the Board discussed  "amendment" of the Appraisal and Consultant Agreement with an attorney from Becker & Poliakoff.  The minutes reflect that 'upon returning" from the executive session, the Board approved an "amended engagement contract."  The

_____

[4]  It does not appear that Mr. O'Driscoll disclosed to the Board that he had a referral arrangement with Mr. Keys, nor that Mr. Mammel and Mr. Keys had a long-standing business and personal relationship.

"amended agreement" (Ex. 15) made two important substantive changes to the original Appraisal

and Consultant Agreement:

- The preamble contains an acknowledgement by Copper Oaks that it had "no preexisting financial relationship with KCC, and to its knowledge, KCC is not affiliated with any party to the appraisal."   The representation that the parties had had no preexisting relationship was patently false in light of the Appraisal and Consultant Agreement that was ostensibly being amended.  As to the representation that Copper Oaks knew nothing about any of KCC's affiliations, it is clear that Copper Oaks knew that Mr. Keys and KCC were affiliated, but the Court understands that this disclaimed any knowledge by Copper Oaks about the personal and business connections between Keys, Mr. O'Driscoll, Mr. Mammel and Becker & Poliakoff.

- The fee cap of 10% of the insurance funds received  is eliminated.   In all other respects,  the "amended agreement" is functionally the same as the earlier Appraisal and Consultant Agreement.  For example,  the amended agreement is devoid of terms common to hourly fee arrangements: specification of who would perform what services at what hourly rate, a provision for submission of periodic statements, provisions for interim payment by Copper Oaks, *etc.*

19.  Keys submitted no bill to Copper Oaks until August 15, 2016, one week after the

Appraisal Award of $2,873,085.35 was announced (Ex. 57).  The single bill reflects 666.40

hours of work, all charged at a rate of $350 per hour, for a total fee of $233,240.  There is no

differentiation in hourly rates based on tasks or by the person performing the task – for example,

clerical time spent making travel arrangements and Mr. Keys' presentation of his appraisal to the

umpire are both billed at $350 per hour.  According to Mr. Keys' testimony, his staff was

supposed to record all time spent on the project, but he acknowledged that neither he nor his staff

focused on hourly charges in formulating the single invoice submitted to Copper Oaks.  For

example, Mr. Keys testified at the hearing that he personally was on site "many, many

occasions"[5] in early 2016, yet the invoice Keys submitted to Cooper Oaks bills only three hours

---

[5] All quotations of witness testimony from the hearing are drawn from the Court's recollection and notes, as well as an unofficial transcript.

of Mr. Keys' time all in a single site visit.  The invoice further reflects that Mr. Keys spent only 7.25 hours in total in preparation of the appraisal, four of which were devoted to emails, communications with the appraisal panel, and a "pro-rated" conversation with counsel.  Mr. Keys testified that he did not keep track of his time at all.  When asked about billing discrepancies that indicated that Keys may have significantly under-billed Copper Oaks based on hours spent, Mr. Keys was *blasé*.  Neither he nor his staff attempted to reconcile time records with their recollections or testimony.

20.  Curiously, even though the "amended agreement" eliminated any reference to the original fee cap of 10% of the insurance award,  Keys' fee of  $233,240 fee ultimately charged was almost precisely that amount -  **9.8%** of the final valuation of the claim by the appraisal panel (that is, the appraisal award less the sum previously already paid by American Family).

21.  The Court pauses at this stage to make certain findings about Copper Oaks' financial relationship with Keys.  Although the initial fee agreement called for Keys to bill its services by the hour, subject to a "cap" that ensured that Copper Oaks would never be obligated to keys for more than 10% of the appraisal award, the Court finds that, in reality, the parties understood and acted as though the "cap" was simply a promise that Keys would be paid 10% of the appraisal award, similar to O'Driscoll and 4 Seasons' contingent fees.  In other words, the Court finds that Copper Oaks never intended to pay Keys on an hourly basis.

Several facts support this conclusion.  Copper Oaks' severely underfinanced reserve account made it impossible for it to pay more than $200,000 to Keys for services rendered unless and until a large appraisal award occurred.  The absence of traditional indicia of an hourly rate agreement, Keys' billing of clerical time at inflated rates, and Keys' own lackadaisical reaction

to questions at trial about his lax timekeeping also suggest to the Court that Keys' "hourly" billings were simply a facade intended to conceal what was, in reality, a standard contingent[6] fee.

Similarly, the parties' purported agreement to modify the fee arrangement to remove the "10% cap" was a transparent attempt to create the illusion that the parties were attempting to reform their fee agreement in light of a recent judicial opinion that declared contingent fees paid to appraisers to, *per se*, require vacatur of appraisal awards. The Court finds that, in reality, the parties intended to adhere to the existing agreement: *i.e.*, that Keys would receive 10% of the appraisal award as payment. The fact that Keys eventually submitted an error-riddled, sometimes inflated invoice that just happened to amount to 9.8% of the value of the appraisal award was no coincidence. Thus, the Court finds that both Copper Oaks and Keys always understood and intended that Keys' payment for serving as appraiser would be a flat 10% of the final appraisal award.

---

[6] The phrase "contingent fee" has several meanings, and the Court endeavors to unpack them somewhat. In its literal sense, the phrase has a conditional meaning – that payment of the fee is "contingent" upon some specific event (such as a verdict favorable to the person receiving the services) occurring. If that event does not occur, no fee is charged. Copper Oaks' fee arrangement with Keys was not "contingent" in this sense, in that it appears that everyone understood that the appraisal process would result in *some* award to Copper Oaks, and that Mr. Keys would receive *some* payment from Copper Oaks.

There is also a temporal component associated with the notion of a "contingent fee." Typically, such a fee arrangement defers the payor's obligation to pay the fee until a certain event, such as entry of a judgment or payment thereupon. Copper Oaks' arrangement with Keys was a "contingent fee" in this sense, as Keys agreed that payment for services would not be due until a final appraisal award was rendered (and, presumably, paid by American Family).

Finally, common use of the term "contingent fee" often refers to fees in which the service provider is given a financial stake in the success of the endeavor, such as when an attorney agrees to accept one-third of any judgment as payment, rather than charging hourly or fixed fees for services. Although the strict terms of Copper Oaks' agreement with Keys was not "contingent" in this sense – Keys agreed to bill on an hourly basis, subject to a cap – for the reasons set forth herein, the Court finds that, in practice, both Copper Oaks and Keys understood and agreed that Keys would be paid no more than 10% of the final appraisal award. Thus, the Court finds that the parties' fee arrangement was "contingent" in this sense as well.

It was therefore essential that the appraisal award be high enough to allow Copper Oaks to pay the bills of Keys, O'Driscoll, and 4 Seasons, plus be sufficient to allow Copper Oaks to repair the buildings.  Indeed, under Keys, O'Driscoll, and 4 Seasons' contingent fee arrangements, Copper Oaks was required to obtain an appraisal award of nearly 128% of actual repair costs, simply to break even.

**DORA Compliance by Mr. Keys**

22.  As noted earlier, Mr. Whipple, Mr. Keys and Mr. Norton[7] agreed to comply with the impartiality and neutrality requirements and required disclosures set forth in the DORA Bulletin.

23.  In conformance with the DORA Bulletin, Mr. Keys made his initial disclosures to via email on March 18, 2016.  He stated  in conclusory fashion that: (1) he was not a party to the Policy; (2) he did not have a financial interest in the outcome of the appraisal; (3) he was billing for his time on an hourly basis; (4) he was not a family member of the insured and had no relationship with any member of Copper Oaks; and (5) he had a continuing obligation to supplement his disclosures upon learning new, relevant facts.  He also attached a copy of the DORA Bulletin B-5.26, as well as his resume.

24.  In additional emails on March 31, 2016, Mr. Keys supplemented his disclosures by stating that he had a minority interest in a claims consulting business in New Zealand, and that one of the partners in that venture was an attorney who was employed by the law firm for which Copper Oaks' counsel previously was a member.  Mr. Keys iterated again that he was being paid by the hour and that he had no interest in the outcome of the appraisal.  He also disclosed that he

---

[7]  While there is no direct evidence that Mr. Norton expressly agreed to be bound by the DORA Bulletin with respect to the Copper Oaks matter, there is documentary and testimonial evidence that he was aware of the appraisers' agreement to abide by the terms of the DORA Bulletin and at the very least did not object to complying with it himself.

had served as an expert for Copper Oaks' attorney in other cases.  He made no further

disclosures.

25.  At no time did Mr. Keys disclose:

- The existence or terms (including the 10% fee cap) of the initial Appraisal and Consulting Agreement, or that his agreement  with Copper Oaks was an amendment agreement that eliminated the fee cap.

- The existence or contents of court decisions issued during the appraisal process in which courts disqualified Mr. Keys and vacated  the appraisal award upon findings of his lack of impartiality and failure to disclose pertinent facts.

  > -AXIS Surplus Insurance Co. v. City Center West LP, 2015CV30453 (Weld County Dist. Ct. Mar. 14, 2016) (# 80-70)

  > - Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n, No. 14-cv-03417-LTB, 2016 WL 1321507, at *3-4 (D. Colo. Apr. 5, 2016)

  > - Church Mutual Ins. Co. v. Broadmoor Cmty. Church, No. 2015CV32454 (Colo. Dist. Ct. El Paso County July 6, 2016) (# 80-71)

- That Mr. Keys had a long-standing personal and professional relationship with Mr. Mammel, who was a principal in the lawfirm retained by the Board at the recommendation of Mr. Keys and Mr. O'Driscoll.

- That Mr. Keys had a long-standing referral relationship with Mr. O'Driscoll.

**DORA Compliance by Mr. Norton**

26.  On March 21, 2016, Mr. Norton disclosed that he did not have any current or

previous relationship with any of the interested parties to the appraisal, and that he had  worked

as an umpire on matters involving Mr. Whipple and/or Mr. Keys on a small number (five or

fewer) of other appraisal proceedings. He stated that he was aware of the continuing obligation to

disclose any new facts learned after appointment that a reasonable person would consider likely

to affect his impartiality but no further disclosures were made.

27.  Mr. Norton was aware of the opinion issued in *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, No. 14-cv-03417-LTB, 2016 WL 1321507 (D. Colo. Apr. 5, 2016), that invalidated his award and disqualified Mr. Keys, as well as the subsequent opinion that imposed sanctions.  *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 198 F. Supp. 3d 1239, 1246-48 (D. Colo. 2016).  In addition, during the appraisal process, he had an *ex parte* discussion about the *Summit Park* ruling with Mr. Keys.  He knew that Mr. Keys made no disclosure to Mr. Whipple and American Family about *Summit Park* or the information that the *Summit Park* court found that Keys should have – but failed to – disclose.  Mr. Norton never disclosed: 1) his conversation with Mr. Keys; 2) the existence of the decision; or 3) the information that the decision found that Mr. Keys should have disclosed.

**The Appraisal Process**

28.  Mr. Keys began work on his appraisal for Copper Oaks in January 2016 and submitted his appraisal on February 29, 2016.  Mr. Keys found that every roof, every elevation, every chimney, and virtually all of the siding on every building at the Copper Oaks' property had either been damaged by hail or, if undamaged, would nevertheless have to be replaced in order to fully repair the hail damage.  His initial loss estimate was $4,968,115.62, which was revised upwards to $5,066,238.99.  This was more than ten times the estimate by Mr. Whipple ($406,234.29), almost eight times the amount estimated by Madsen, Kneppers & Associates ($608,393.49), and almost 50% greater than the estimate by the public adjuster, Mr. O'Driscoll ($3,599,707.13).[8]

29.  Mr. Keys and Mr. Whipple each submitted  an appraisal to Mr. Norton, and the

---

[8]  This difference potentially had a direct effect on the fees that were recoverable by Mr. Keys and Mr.O'Driscoll.  With a 10% cap, Mr. Keys could receive upwards of $450,000 ($5 million less the amount paid by American Family); with his 15% fee, Mr. O'Driscoll would recover approximately $675,000.

three began extensive discussions and inspection of the property.  The fundamental dispute was

whether there was any hail damage caused by the storm and, if so, what size of hail impacted the

property.  There was no contemporaneous evidence that hail had impacted any part of the

property – no statements of occupants, photos or the like.  Furthermore, there were conflicting

assumptions in the two appraisals concerning the size of hail that had fallen at the Copper Oaks

site.  According to the volunteer collection station data relied upon by Mr. Whipple, collection

stations in relative close proximity to the property (1.8 miles or less) recorded hail ranging from

a quarter inch to a half inch on the date in question.  Based on this, when Mr. Whipple conducted

testing to determine the damage caused by ice projectiles fired at brick surfaces, he assumed a

maximum hail size of one inch and concluded for hail of that size or less, no damage could have

been caused to the brick elevations at Copper Oaks.  According to the NOAA data relied upon by

Mr. Keys, hail of up to 1.75 inches in size was observed, though this large hail occurred

significantly farther – approximately 3.5 miles – from the Copper Oaks site.   Mr. Key's

appraisal relied on a report prepared by SBSA at the behest of Mr. O'Driscoll and Impact Claim

Services, LLC in assuming widespread hail damage.

     30.  Mr. Norton hired a consultant, Carl Martin of Engineering Perspectives Inc., to

evaluate whether hail had impacted Copper Oaks and, if so, whether it caused damage to all of

the brick and wall surfaces in the complex.  Mr. Martin's conclusions were that some softer brick

might have been damaged, but that the extent of the damage was a function of how much soft

brick there was.  (Ex. 219.)  In addition, he observed that some bricks displayed chip damage,

but that "the repair method to address any chipped brick, regardless of cause of chipping…

would typically be surface sealer application," rather than wholesale replacement of all chimneys

and brick walls.  (Ex. 218.)

31. Ultimately, Mr. Norton concluded that there had been some hail damage, but not to the extent claimed by Mr. Keys.  In July 2016, Mr. Norton proposed an appraisal award of $3,061,201.44.  Neither Mr. Keys nor Mr. Whipple agreed with the proposed amount.  Mr. Norton eventually advised Mr. Keys and Mr. Whipple that if they could not come to some agreement, he would circulate a proposed final award.

32. Mr. Norton's second proposal of $2,943,919.72 was conveyed by an August 4, 2016 email.  It stated that if not signed, Mr. Norton would be put "in a position that I do not wish to be that may require a very significant shift upwards." (Ex. 133.) Mr. Whipple understood this to be a threat directed at American Family – in essence, "agree or the amount goes up."  Mr. Whipple strongly objected to the "significant shift upwards" language, noting that there should be no reason that the proposed final award necessarily would be adjusted upward, and further criticizing "the one-sided negotiation tactics being employed in an attempt to strong-arm this appraisal to a higher award."  Mr. Norton testified that he did not intend to convey a threat, because such a threat would be "arbitrary and inappropriate and unprofessional and unacceptable."

33.  The Court finds that Mr. Norton's email warning that if the second proposed award was not signed then there might be "a very significant shift upwards" was an unambiguous threat to American Family designed to compel Mr. Whipple's signature.  Contrary to the explanation by Mr. Norton, the risk it injected was not neutral but one-sided.  In addition, it was important that Mr. Whipple agree to accept the proposal to insulate it from future challenge.  Only three days prior, the insured represented by Mr. Keys was sanctioned in *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 198 F. Supp. 3d at 1246-48, for his failure to disclose pertinent

information including the existence of an amended fee agreement like the "amended agreement"

used with Copper Oaks.

34.    The next day, Mr. Norton circulated a proposed final award of $3,073.238.51 which

reflected an increase of approximately $130,000 above that proposed the day before, and two

million dollars, or 40%, less than that calculated by Keys.   Mr. Keys agreed to sign the award.

With Mr. Norton's and Mr. Keys' signatures, the award became final, and on September 9, 2016,

American Family tendered payment of the final appraisal award amount, less previous payments,

under a reservation of rights.

## IV.  LEGAL STANDARDS

There have been many hail damage insurance claims in Colorado over the past years, and

there is a growing number of judicial decisions addressing the roles of appraisers and umpires

under insurance policies like the one at issue in this case.

Turning first to establishing the standards that govern the conduct of appraisers (who

must be "impartial" under the Policy language) and umpires (for whom the Policy provides no

standards), courts have struggled with the question of whether appraisers and umpires must be

"neutrals," in the sense that arbitrators or special masters might be, or whether some degree of

bias is permitted.   For example, in *Summit Park* and *AXIS*,  courts relied on an earlier version of

the DORA Bulletin, which adopted a standard of appraiser impartiality based upon the neutral

arbitrator standards of the Colorado Uniform Arbitration Act (C.R.S. § 13-22-223).[9]   However,

---

[9] *See also Colo. Hospitality Servs. Inc. v. Owners Ins. Co.*, No. 14-CV-001859-RBJ, 2015
WL 4245821, at *2-3 (D. Colo. July 14, 2015) (appraiser impartiality required that the appraiser
be neutral as an arbitrator would be under the  Colorado Uniform Arbitration Act.   Because the
appraiser's compensation arrangement included a fee cap of 5% of the award, the appraiser was
not neutral, and thus the appraiser was disqualified and the appraisal award invalidated).   In
*Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, No. 14-cv-03417-LTB, 2016 WL
1321507, at *3-4 (D. Colo. Apr. 5, 2016), *aff'd* 886 F.3d 852 (10th Cir. 2018), advocacy on
behalf of public adjusters and insureds as well as non-disclosures required disqualification of the

in *Owners Ins. Co. v. Dakota Station II Condominium Ass'n, Inc.,* --- P.3d ----, 2017 WL

3184568 (Colo. App. Jul. 27, 2017), the Colorado Court of Appeals considered the nature and

function of the appraisal process to give the term "impartial" meaning.   It adopted the definition

of "impartial" used by the Iowa Supreme Court in *Central Life Ins. Co. v. Aetna Casualty &*

*Surety Co.*, 466 N.W.2d 257, 261 (Iowa 1991).  The majority defined the policy standard,

"impartial appraiser," in a functional fashion – that the appraiser is not impartial in the same

sense as a "judge, umpire or arbitrator," but instead, has a duty more like an expert witness at

trial.  As the Colorado Court of Appeals held:  "We understand this to mean that an impartial

appraiser in rendering his or her valuation opinion applies appraisal principles with fairness,

good faith, and lack of bias." *Dakota Station II*, 2017 WL 3184568, at *2.

The second area where courts diverge is in formulation of standard that must be satisfied

in order to disqualify an appraiser/umpire and invalidate an appraisal award.   Two different

approaches have emerged, which this Court will describe as the "federal" and "state"

approaches.   Some decisions, including all of those issuing from the federal court in the District

of Colorado (hence, the "federal" approach), have applied a categorical rule.   If the appraiser has

a duty to be "impartial" and is not, then he or she is disqualified without any showing of an effect

of the lack of impartiality on the appraisal process or award.  Under this approach, a harm or loss

is presumed simply by virtue of the appraiser's or umpire's failure to meet the standard required

in the policy. *Summit Park*, 2016 WL 1321507, at *3-4; *Colo. Hospitality Servs.*, 2015 WL

4245821, at *2-3; *see also Church Mut. Ins. Co. v. Coutu*, 17-cv-00209-RM-NJW, 2017 WL

---

appraiser.   This approach has been implemented by some Colorado state trial courts as well. *See*
*AXIS Surplus Ins. Co. v. City Center W.*, LP, No. 2015CV30453 (Weld Cty. Dist. Ct. Mar. 14,
2016); *Church Mut. Ins. Co. v. Broadmoor Cmty. Churc*h, No. 2015CV32454 (El Paso Cty. Dist.
Ct. July 6, 2016).

4029589, at *5-8 (D. Colo. Sep. 13, 2017) (recommending vacatur due to contingency fee); *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 886 F.3d 852, 856-57 (10th Cir. 2018) (holding that the *Summit Park* district court "reasonably" concluded that the appraiser was impartial).

The "state" approach (which the Court derives from *Dakota Station II*, even though there are many state trial court decisions that employ the "federal," categorical approach) requires two showings in order to disqualify an appraiser or umpire and to invalidate an arbitration award. First, there must be a showing that the appraiser did not meet the policy requirement (*i.e.*, the appraiser was required to be impartial and was not). Second, there must be a showing that such failure to satisfy the policy requirement actually affected the appraisal process or award – that is, that the lack of impartiality resulted in a distortion of the process or a flawed award. This approach is endorsed by the majority writing for the Colorado Court of Appeals in *Dakota Station II*.[10] Consistent with this functional definition, the state approach requires a showing that

---

[10]       *Dakota Station II* is a decision of Colorado's intermediate appellate court on an unsettled issue of Colorado law, and as such, it is entitled to persuasive, but not controlling, weight. *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240 (10th Cir. 2003); *May v. Travelers Prop. Cas. Co. of Am.*, 263 Fed. App'x 673, 680 (10th Cir. 2008). It is currently on review on *certiorari* by the Colorado Supreme Court with regard to two issues.

(1) Whether the court of appeals' rule permitting insurance appraisers to "favor one side more than the other" and act as "advocates" for the selecting party conflicts directly with [the Colorado Supreme Court's] holding in *Providence Washington Ins. Co. v. Gulinson* that such "[appraisers are not [arbitration] referees, but their duty of impartiality is the same." 215 P. 154,155 (Colo. 1923).

(2) Whether the court of appeals' rule permitting insurance appraisers to utilize contingent-cap fee agreements that tie the appraiser's compensation to the ultimate appraisal award conflicts directly with the holding from *Providence Washington Ins. Co. v. Gulinson*, 215 P. 154,155 (Colo. 1923), that such appraisers must be impartial in the same manner as an arbitrator.

the lack of impartiality affected a particular action, decision or analytical choice made by the appraiser.

This Court need not weigh in on either of these questions in this case.  As to the issue of whether an "impartial" appraiser must be neutral or may favor one side, the parties' agreement to be bound by the DORA Bulletin suffices to resolve the matter.  The DORA Bulletin specifically requires party-appointed appraisers to be "fair and competent," which it further defines to mean that the appraiser i) is not a party to the insurance contract, ii) has no financial interest in the outcome of the appraisal, iii) is not a current employee of the insurer or policyholder; and iv) is not a family member or an individual with whom the insured has a personal relationship that could reasonably suggest bias.  The Court will apply that standard as the one chosen by both parties here.  As to the question of whether the "state" or "federal" approach applies, the Court need not attempt to resolve that issue either.  For the reasons set forth below, the Court finds that the appraisal award here must be set aside under both standards.

## V.  ANALYSIS

The Court begins with the Policy's terms, with the goal of giving effect to the parties' intent.  *Ad Two, Inc. v. City & Cty. of Denver*, 9 P.3d 373, 376 (Colo. 2000).

### A.  Whether Mr. Keys and Mr. Norton were "impartial"

The Policy describes an appraisal process which requires each party to select a "competent and impartial appraiser*,*" but it offers no definition for the terms "competent" or "impartial."   However, the parties have expressed their intent[11] in adoption of the provisions of

---

[11] As agents for Copper Oaks and American Family, Mr. Keys proposed and Mr. Whipple agreed to be bound by the DORA Bulletin provisions.  Since then, Copper Oaks has expressly argued for application of such provisions.  Although it advocates for a more general definition of impartiality, American Family has never repudiated Mr. Whipple's agreement to those terms.

the DORA Bulletin.  The DORA Bulletin requires that an appraiser be "fair and competent" and an umpire to be "fair, competent and impartial."  It then sets out a number of requirements for each.  As is pertinent to this matter, an appraiser is prohibited from having a "direct material interest in the amounts determined by the appraisal process."  DORA Bulletin B-5.26(A)(1).  In addition,  an appraiser has a continuing obligation to disclose "facts that a reasonable person would consider likely to affect the appraisers' interest in the amounts determined by the appraisal process."  *Id.* at (A)(2), (3).  The Bulletin does not define what a "direct material interest" is, but as an example, it refers to a contingency payment arrangement.  The required disclosures must be made to all parties.  The Bulletin does not define who the parties are, but it is fair to assume that they include the parties to the contract (here, Copper Oaks and American Family), the appraisers (Mr. Keys and Mr. Whipple), and the umpire (Mr. Norton).  With regard to umpires, the pertinent provisions of the DORA Bulletin require that an umpire remain neutral and that the umpire not have any communication with an appraiser without participation by both parties.  DORA Bulletin (B)(1), (B)(4).

With these standards in mind, the Court turns to the questions of whether Mr. Keys was "fair and competent" and whether Mr. Norton was "fair, competent and impartial."

1. <u>Mr. Keys</u>

The Court finds that Mr. Keys was not "fair and competent" because he had a "direct material interest in the amounts determined by the appraisal process" and because he did not disclose "facts that a reasonable person would consider likely to affect the appraisers interest in the amounts determined by the appraisal process."

a. Financial interest

The Court begins with Mr. Key's interest in the amounts determined by the appraisal process.   By its nature, the policy's appraisal process pits two competing appraisals, one high and one low, against each other, with their differences to be reconciled by the umpire. Presumably, Mr. Key's appraisal set the ceiling for the appraisal award (that is, the maximum possible award the umpire could give) and Mr. Whipple's set the floor (the minimum possible award).  If an appraiser's fee is determined by the amount of the award, it is in the appraiser's self-interest to inflate the appraisal amount the largest extent possible.  As the DORA Bulletin recognizes, an appraiser working under a contingent fee arrangement is a classic example of a person with a material financial interest in the outcome.

As discussed above, the Court finds that Keys' agreement with Copper Oaks tied Keys' fee directly to the appraisal award.  The first agreement provided that the fee would be calculated on an hourly basis, subject to a cap of 10% of the insurance funds received.   Every court that has considered a percentage fee cap arrangement of this type – except *Dakota Station II* – has found it impermissible.  As  Judge R. Brooke Jackson explained in *Colorado Hospitality Servs. Inc. v. Owners Ins. Co.*, No. 14-CV-001859-RBJ, 2015 WL 4245821 (D. Colo. July 14, 2015):

> Mr. Lodge's fee was capped at "5% of the replacement cost value of the final claims if an umpire is involved."  Thus, the higher his appraisal, the higher the cap on his fee.  If, for example, the replacement value of the loss were determined by the appraisal process to be $50,000, Mr. Lodge's fee would be capped at $2,500.  But if the replacement value of the loss were set at $1,000,000, his fee would be capped at $50,000.  An expert whose fee might be materially affected by the opinion he expresses cannot be considered to be "impartial" under any reasonable definition of that term.

*Id.* at *2.

Copper Oaks urges the Court to apply the reasoning of the sole outlier decision, *Dakota Station II*, which found that an appraiser's percentage fee cap did not necessarily create an

impermissible interest in the appraisal award.  *Dakota Station II*'s conclusion, however, is based

on different facts.  There*, the appraiser's contract included a fee cap of "5% of the total

replacement cost value," but the court found that the parties had not initialed, and thus not agreed

to, that particular provision of the contract.  Moreover, the ultimate fee charged by the appraiser

in *Dakota Station II* was substantially less than the 5% cap, suggesting that the cap provision was

not the primary driver of the fees charged by the appraiser.  *Dakota Station II*, 2017 WL

3184568, at *7-8.

       Here, it is clear that the 10% fee cap was an important – indeed, critical – component of

the fee agreement to both Copper Oaks and Keys.  As to Copper Oaks, it was essential that Keys

deliver an appraisal award that significantly exceeded the actual cost of repair, as Copper Oaks

otherwise lacked the resources to pay for Keys and O'Driscoll's services out of its own funds.

Giving Keys a direct stake in the award thus gave Keys an incentive to deliver the highest

possible appraisal figure (or even an impossibly high figure, given Copper Oaks' need to recover

more than 125% of its loss in order to break even).  This is not a situation like *Dakota Station II*,

where the existence of a contingent fee award had no apparent bearing on the appraisal award.

Here, it is clear that Keys billed services to account for the full amount of the contingent fee.

       After Judge Jackson issued the *Colorado Hospitality* decision, it was clear that the

contingent fee agreement would have fatal consequences on Keys' ability to serve as Copper

Oaks' appraiser.  Copper Oaks and Keys discussed the issue in September 2015, entering into an

"amended agreement" that eliminated the fee cap.  As noted above, the Court finds that the

purported abrogation of the fee cap was merely cosmetic, and that both sides fully intended that

Keys would still be paid 10% of the final appraisal award for its services.  Moreover, the

amended agreement recited a patently-false statement: that there was no previous fee agreement.

The falsehood was important so as to further insulate the parties from the possibility that the *Colorado Hospitality* decision would be construed to require Keys' disqualification based on the original fee agreement.

For the reasons set forth above, the Court finds that Keys' initial fee arrangement with Copper Oaks was never substantively amended. The parties understood and agreed that Keys' fee would be fixed at 10% of the final appraisal award, with "hourly" billing being irrelevant. The percentage cap gave Keys a material interest in the appraisal award preventing him from being "fair and competent" in accordance with the DORA Bulletin, and therefore "impartial" under the Policy.

### b. Disclosures

The Court also finds that Mr. Keys failed to make disclosures required by the DORA Bulletin. As previously noted, the DORA Bulletin imposed a continuing obligation on Mr. Keys to disclose information that "a reasonable person would consider likely to affect [his] interest in the amounts determined by the appraisal process."

There is no dispute that Mr. Keys made general disclosures during March 2016, stating that: 1) he was not a party to the Policy; 2) he did not have a financial interest in the outcome of the appraisal; 3) he was billing for his time on an hourly basis; 4) he was not a family member of the insured and had no relationship with any member of Copper Oaks; and 5) he had a continuing obligation to supplement his disclosures upon learning new, relevant facts. Certain of these disclosures were false or misleading: Mr. Keys was nominally billing by the hour, but in reality, he and Copper Oaks had agreed upon a contingent fee payment that gave him a direct financial interest in the outcome of the appraisal. He also failed to disclose his referral

relationship with Mr. O'Driscoll, whose contingent fee of 15% was also based on the appraisal award.

In addition, during the appraisal process, three judicial decisions disqualified Mr. Keys and put him on notice of particular information that he should be disclosing in cases where he served as appraiser.  Mr. Keys did not disclose the existence of those decisions or the information that the courts in each instance said should have been disclosed.  In fairness, these decisions did not apply the DORA Bulletin standards adopted here, and for this reason, the Court does not find that Mr. Keys automatically had an obligation to disclose the existence of or outcome of those judicial decisions.  But in each decision, the issuing court identified specific information that Mr. Keys should have disclosed.   For example, in March 2016, the Colorado state District Court for Weld County disqualified Mr. Keys finding that he failed to disclose his general  pro-public adjuster advocacy, his relationship with the public adjuster,  and his extensive personal and business relationship with Mr. Mammel and Mr. Mammel's law firm.  *AXIS Surplus Ins. Co. v. City Center W., LP*, No. 2015CV30453 (Weld Cty. Dist. Ct. Mar. 14, 2016).  The *AXIS Surplus* court observed that Mr. Keys "had to know that this information would cause [the insurer] concerns," and found that his "nondisclosure only raises suspicions about his impartiality and creates the appearance that he was trying to hide" the damaging information.

Nevertheless, even after being chided by *AXIS Surplus* for concealing these facts, Mr. Keys never disclosed those facts to American Family or Mr. Whipple.  This is significant, as the DORA Bulletin standard requiring disclosures is a fairly broad one, requiring disclosure of "facts that a reasonable person might believe important" if they bear on whether Mr. Keys had "a material interest" in the appraisal award.  Arguably, Mr. Key's general pro-public adjuster advocacy would not fall within DORA requirements because it does not pertain to whether Mr.

Keys had a material interest in the Copper Oaks appraisal award.  However, his relationships with Mr. O'Driscoll and Mr. Mammel certainly fell within the DORA disclosure requirements because a reasonable person might believe – indeed, the judge in the Weld County District Court certainly believed – that such relationships could suggest Mr. Keys' material interest in the award.  Mr. O'Driscoll was dependent upon a generous appraisal award for his 15% contingent fee, and Mr. Keys both benefitted from Mr. O'Driscoll's referral of him to Copper Oaks as well as any future referrals.  A reasonable person very well could conclude that these relationships could motivate Mr. Keys to improperly skew his appraisal in order to drive the appraisal award upward.  Mr. Keys' long friendship and professional association with Mr. Mammel and his law firm[12] is also a fact that a reasonable person could consider important in evaluating Mr. Keys' own interest in an appraisal award.  Copper Oaks hired Mr. Mammel's law firm at the suggestion of Mr. O'Driscoll and Mr. Keys, without ever disclosing that Mr. Mammel had a longstanding professional and personal relationship with Mr. Keys.  Copper Oaks was entitled to know whether the firm's ancillary relationships created a potential conflict of interest, especially when it was subsequently induced by Mr. Keys and Mr. Mammel's firm to amend the fee agreement to include a false representation.  American Family was also entitled to disclosure of the full extent of Mr. Keys' personal and professional relationships with Mr. Mammel.  These connections bear upon Mr. Keys' loyalty to Copper Oaks and commitment to appropriate rigor in his appraisal analysis.

A month later, Mr. Keys was disqualified and the appraisal award rendered by Mr. Norton was invalidated in *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, No. 14-cv-03417-LTB, 2016 WL 1321507, at *3-4 (D. Colo. Apr. 5, 2016).  The court found that Mr. Keys

---

[12]  Over the course of the many cases in which Mr. Keys' impartiality has been an issue, Mr. Mammel or his law firm has represented the insured.

again failed to make necessary (and court-ordered) disclosures, including a disclosure that Mr.

Keys had modified his fee agreement with the insured there in the same way and at roughly the

same time as he did with Copper Oaks.  Judge Babcock specifically found that Mr. Keys had an

obligation to disclose the amendment to the fee agreement because the original agreement was in

the nature of a contingent fee.  The DORA Bulletin lists a contingent fee as a specific example of

a material interest in an appraisal award.  Thus, the Court can find no justification for Mr. Keys'

failure to disclose the existence and contents of the original Appraisal and Consultant Agreement

to American Family, except to hide facts that he knew could impact his interest in the fee award.

Finally, in July 2016, Mr. Keys was disqualified due to his extensive business

relationship with the public adjuster and his pro-policyholder views in *Church Mut. Ins. Co. v.*

*Broadmoor Cmty. Church*, No. 2015CV32454 (El Paso Cty. Dist. Ct. July 6, 2016).  The state

trial court found it particularly troubling that Mr. Keys had an established relationship with the

public adjuster at issue in the case (having served as an appraiser in fifteen appraisal proceedings

involving that appraiser), that he had a longstanding record of being an outspoken advocate for

policyholders and policyholder interests, and that he failed to disclose both of these facts to the

insurer or the insurer's appraiser.  The trial court also took note of the fact that at that time, Mr.

Keys had recently been disqualified in two separate cases (presumably *AXIS Surplus* and *Summit*

*Park*); the court analogized Mr. Keys' failure to disclose his relationship with counsel in that

case with his failure to disclose his relationship with the public adjuster in the case before it.  Of

this information, Mr. Keys' relationship with the public adjuster in the instant case fell within the

DORA Bulletin disclosure obligations, yet he did not disclose it.  Once again, the Court can see

no justification for this silence.

At the hearing, Mr. Keys offered no explanation as to why he did not disclose the information identified in these opinions.  The Court can only assume that he was aware of his ongoing disclosure obligations towards the parties here, yet he purposely chose not to comply with them.  His failure to disclose information that a reasonable person (indeed, judges in three separate cases) believed might be important in determining whether Mr. Keys had a material interest in the appraisal award also prevented him from being "competent and fair" under the DORA Bulletin.

### c.   Disqualification

The finding that Mr. Keys was not "competent and fair" under the DORA Bulletin and thus not "impartial" under the Policy is sufficient to disqualify him and to invalidate the appraisal award under the categorical "federal" approach as discussed above.  But disqualification of an appraiser under the "state" approach, exemplified by *Dakota Station II*, also requires a showing of evidence that Mr. Keys' the lack of impartiality affected his action, decision or analytical choices during the appraisal.  That is, Mr. Keys' partiality must have resulted in actions that distorted the appraisal process or led to a fundamentally unfair award.

Mr. Keys' lack of impartiality infected multiple decisions and choices.  Beginning with his fee agreement, in the amended version of that document he falsely represented  that  there was no earlier fee agreement.  Although Judge Babcock had already addressed an identical situation in *Summit Park*, Mr. Keys continued the ruse here.  The Court finds that this was a conscious attempt to conceal the existence of the troublesome fee cap provision from American Family.  Then, in discussing the case with Mr. Norton on an *ex parte* basis during the appraisal process, he continued the deception.  Never during the appraisal process did Mr. Keys disclose the existence of the original Appraisal and Consultant Agreement with the percentage fee cap.

This non-disclosure amounted to a distortion of the process, insofar as it deprived American

Family of critical information bearing on Mr. Keys' ability to render a valid award in light of the

*Summit Park* decision.

In addition, the Court finds that Mr. Keys' partiality resulted in him submitting an

inflated appraisal based on assumptions about hail damage for which he had no support.  Mr.

Keys' appraised Copper Oaks' loss at $5,066,238.99, almost 50% greater than the estimate by

Copper Oaks' own public adjuster, Mr. O'Driscoll ($3,599,707.13).  The gap is attributable, in

large part, to Mr. Keys' belief that <u>every</u> chimney and <u>every</u> wall (brick and siding) of <u>every</u>

building at Copper Oaks had been damaged by hail and required replacement.  In essence, Mr.

Keys' appraisal is that the hail storm in question caused the maximum possible amount of

exterior damage possible.  Notably, the conclusion that all building walls were damaged was

based on the remarkable proposition that the hail storm in question was able to cause impact

damage from at least two opposing directions during the same weather event, rather than along a

single storm path.

Mr. Keys' offered no specific support for this remarkable conclusion.  The complete

appraisal report that he submitted to Mr. Norton was never admitted into evidence.  Instead, the

record with regard to this assumption is limited to Mr. Keys' cover letter to Mr. Norton dated

February 29, 2016 (Ex. 138), some documents identified in it that were admitted into evidence,

and Mr. Keys' own  testimony.  The cover letter indicates that Mr. Keys consulted two

engineering reports, the Madsen Kneppers & Associate, Inc. report (Ex. 222) and the SBSA

report (Ex. 221), to reach his conclusions about the cause of Copper Oaks' loss.  Both reports

find hail damage to roofs, bricks and walls could be caused by the storm, but also note  brick and

wall damage in protected areas – such as under overhangs and on soffits – that could not possibly

have been caused by hail impacts.  Neither report concludes that the 2013 storm caused widespread hail damage to every side of every chimney and every wall of every building.  To the contrary, the SBSA report addresses only eight of fourteen buildings with brick cladding, and finds only some of the brick damage attributable to "recent events" as compared to aging and long-past events.  The report concludes that "bricks on the facades at the Copper Oaks site were damaged as a result or the September 9, 2013 hail storm," but that "it was not within SBSA's scope to estimate the quantity of brick damaged by the aforementioned storm."   The Madsen Kneppers & Associates report is even more circumspect.  It finds that although brick chips were observed, "[i]t is unreasonable to assume or specify a particular cause of a masonry chip (in this case hail) when they may and frequently do occur during manufacturing, handling, shipping, installation and the natural weathering process."

This leaves Mr. Keys' testimony at trial. The Court finds that Mr. Keys' testimony was often evasive, ambiguous, and largely incredible.   In response to many questions by the Court and counsel, Mr. Keys never described any methodology that he used to determine the scope of the hail damage.  When asked how he determined that all sides of all buildings were damaged by the 2013 hail storm, he stated that an amorphous "we" (by which the Court understands to be Mr. Keys and his staff) simply looked at all of the chimneys and elevations of all of the buildings. When asked by the Court whether there were any elevations that did not show hail damage, he gave a very limited response based on his personal knowledge: "I am not familiar with any elevations that did not show any hail damage, no, ma'am."   When asked how he determined that the hail storm hit all four sides of every single building, he responded, "what I have been able to learn from the engineers is when storms come through, hail predominantly comes through one side and after it passes by, hail also to a lesser degree comes from a different angle."  Never did

Mr. Keys offer a specific and credible explanation as to how hail in the 2013 storm could have damaged every side of every chimney and every wall of every building in the complex, including damage under overhangs and soffits.  It appears that Mr. Keys simply assumed that any visible damage to any brick or wall board on any portion of any building was necessarily caused by the 2013 hail storm, regardless of the age of the building or the general condition of the exterior brick or wall board.  Mr. Keys also appears to have concluded that even portions of surfaces that displayed no damage would nevertheless have to be replaced completely, ostensibly because brick repairs could only be completed on an elevation-by-elevation basis.  This conflicts with the reports that Mr. Keys ostensibly relied upon, which suggest that damaged bricks can often be replaced on a brick-by-brick basis or that replacement is not necessary if the bricks can be resealed.

In total, the Court finds that Mr. Keys' appraisal was so bereft of methodology and supporting evidence as to be completely implausible.  This outcome, which the Court finds to have been a fundamentally unfair appraisal, can most likely be explained by Mr. Keys' partiality and material interest in inflating the outcome of the appraisal process.  Accordingly, even under the "state" standard exemplified by *Dakota Station II*, the Court finds that Mr. Keys' partiality had an articulable and demonstrable effect on the appraisal process.  Thus, under either the "federal" or "state" standards, Mr. Keys' partiality requires his disqualification and the vacatur of the appraisal award.

2. <u>Mr. Norton</u>

Turning to Mr. Norton's role as the umpire, the DORA Bulletin not only required Mr. Norton to make ongoing disclosures of information that a reasonable person would think was

likely to affect his impartiality, but it also precluded him from having *ex parte* communications with parties or their appraisers.

Assuming, without deciding, that Mr. Norton's disclosures regarding prior work with Mr. Keys as party-appointed appraiser were adequate, the Court finds that Mr. Norton violated the DORA Bulletin standards in two ways. First, he engaged in an impermissible *ex parte* conversation with Mr. Keys during the appraisal process. In his testimony before the Court, Mr. Norton acknowledged that he was aware of the *Summit Park* decision and that he had discussed it with Mr. Keys. Although he tried to minimize that communication, his testimony is quite clear that such a conversation occurred:

> Q. That's my understanding. All right. So with respect to this disclosure in March of 2016, we – you testified a little bit about your knowledge of Judge Babcock having vacated an award in *Summit Park*. That award was vacated a couple of weeks after this disclosure, right?
>
> A. Generally, yes.
>
> …
>
> **Q. Did you ever talk to the appraiser, Mr. Keys, about that order by Judge Babcock?**
>
> **A. Not in any level of detail.**
>
> **Q. All right. What level of detail did you go to with Mr. Keys on that order?**
>
> **A. The – just that the ruling of the Court was made, but really it was not discussed.**
>
> Q. Now, Mr. Keys also made disclosures in this case – in this underlying appraisal; do you recall that?
>
> A. I need you to describe whether you're talking continuing with *Summit Park* or back to Copper Oaks.
>
> Q. I'm sorry, thank you for that. I'm talking about in this case, *Copper Oaks*?
>
> A. Restate the question.
>
> Q. Mr. Keys made disclosures?

A. To the panel, yes, sir.

Q. And, in fact, we just looked at one of the supplementations concerning his expert work with Mr. Mammel, right?

A. Yes, sir.

**Q. Okay. Did you ever see any supplementation by Mr. Keys concerning the *Summit* – concerning the *Summit Park* vacatur order?**

**A. He made supplemental disclosures, one of which we looked at. I believe there was more than one. I'm not certain, but I don't believe there was any specific statement regarding *Summit Park*.**

(Unofficial 5/24/18 Transcript (emphasis added).)   It is clear from the record that Mr. Whipple was not present during this conversation.  Such a conversation bears on the issues before the appraisal panel, and because the DORA Bulletin categorically prohibits *ex parte* conversations among appraisers, Mr. Norton's conversation with Mr. Keys about the *Summit Park* decision and Mr. Keys' disqualification constitute improper conduct by Mr. Norton.   In addition, Mr. Norton further violated his disclosure obligation by not revealing to Mr. Whipple or to American Family that he had had that *ex parte* conversation with Mr. Keys about the opinion.

Mr. Norton's subjective assessment of whether the *Summit Park* decision would affect his impartiality was irrelevant.  His obligation to disclose turned on whether a reasonable person might consider such facts likely to affect his impartiality.  Certainly, an umpire cannot be required to disclose the existence of every adverse ruling issued with regard to an appraisal award.  But Mr. Keys recommended that Mr. Norton be the umpire in this case, Mr. Keys was disqualified in *Summit Park* for lack of disclosure of a great deal of information concerning prior associations and his prior appraisal agreement, Mr. Norton and Mr. Keys had an *ex parte* discussion about the *Summit Park* opinion during this appraisal process, and Mr. Norton was aware that Mr. Keys had not disclosed any information about the *Summit Park* decision to American Family.  A reasonable person could view these facts as suggesting that Mr. Norton had

a bias in favor of Mr. Keys, or that Mr. Norton wished to help Mr. Keys by concealing information which might have been of concern to American Family.

Thus, under the DORA Bulletin standards, Mr. Norton was not "fair, competent and impartial."  Under the categorical "federal" approach, this alone is sufficient to invalidate the appraisal award.

If the "state" standard of *Dakota Station II* is applied, invalidation of the award is also justified.   Evidence of Mr. Norton's subjective bias appears in a threat to Mr. Whipple, made in the last stage of appraisal negotiations.  It is undisputed that on August 4, 2016, Mr. Norton sent an email to Mr. Whipple and Mr. Keys stating that if they did not agree to the appraisal award he proposed that it could result in "a very significant shift upwards."  Such a shift would necessarily be to the detriment of American Family (and to the benefit of Copper Oaks and Mr. Keys personally), and it is not surprising that Mr. Whipple understood the statement to be a threat directed at him.  Mr. Norton subsequently carried out that threat, issuing an increased proposed award the following day (and securing the support of Mr. Keys to make the award final).  Even Mr. Norton concedes that threatening Mr. Whipple – and the Court finds that he did – would be "arbitrary and inappropriate and unprofessional and unacceptable."  The Court would find that an umpire's threat to punish an appraiser who refused to agree to a proposed award by further adjusting that award to the detriment of the refusing appraiser's client is a fundamental abrogation of the umpire's role as a neutral and a distortion of the appraisal process.  Therefore, under the state standard, Mr. Norton's partiality requires vacatur of the appraisal award as well.

## B.    Copper Oaks' Affirmative Defenses

Copper Oaks has nominally asserted affirmative defenses of waiver, estoppel, and laches, but none of the defenses were developed through evidence or argument.  The Court understands

34

that they are variations upon Cooper Oaks' overarching argument that American Family's challenge to the appraisal award was untimely and thus should be barred.

Under Colorado law, waiver is the intentional relinquishment of a known right; it may be express, as when a party states its intent to abandon an existing right, or implied, as when a party engages in conduct which manifests an intent to relinquish the right or acts inconsistently with its assertion. *In re Marriage of Robbins*, 8 P.3d 625, 630 (Colo. App. 2000). To constitute an implied waiver, the conduct must be free from ambiguity and clearly manifest the intent not to assert the benefit. *Burlington N. R.R. Co. v. Stone Container Corp.*, 934 P.2d 902, 905 (Colo. App. 1997). A waiver thus requires full knowledge of all the relevant facts. *Johnson v. Indus. Comm'n of State of Colo.*, 761 P.2d 1140, 1147 (Colo. 1988).

The essence of Copper Oaks' argument is that American Family knew of the *Summit Park* decision before the appraisal process was complete, and that by proceeding to complete the appraisal process nonetheless, it waived any objection to Mr. Keys' participation. The only evidence to support this argument was testimony from an American Family claim manager to the effect that some employees of American Family became aware of the April 5, 2016 *Summit Park* decision shortly after it was issued, and that American Family did not seek to postpone or halt the Copper Oaks appraisal to challenge Mr. Keys' participation.

Copper Oaks' showing is inadequate for several reasons. First, there is no showing <u>what</u> undisclosed American Family employees knew about the *Summit Park* decision, much less that it supplied information to American Family which would have allowed it to seek to remove Mr. Keys or stop the appraisal process. The *Summit Park* decision was based on application of the Colorado Uniform Arbitration Act's principles, but the parties here had agreed to a different set of standards – the DORA Bulletin – to govern the appraisal panel's conduct. Even more

importantly, the salient portion of the *Summit Park* opinion concerned the existence of Mr. Keys'

modified fee agreement.  Since Mr. Keys had never disclosed that he also modified his fee

agreement with Copper Oaks, American Family had no way to know that of the significance of

the similarity.  Finally, imposing a waiver theory on American Family would be unjust where the

Court has found that Mr. Keys and Mr. Norton failed in their obligation to disclose numerous

important facts.  The Court might be willing to conclude that a <u>fully-informed</u> American Family

consciously waived its ability to abort the appraisal process by not acting sooner, but the Court is

not willing to find a waiver by a party who lacked full information.  Again, under Colorado law,

waiver is the voluntary relinquishment of a <u>known</u> right.  Here, Copper Oaks has not shown that

American Family was fully aware of its rights.

As an alternative theory, Copper Oaks invokes the common law doctrine of equitable

estoppel.  It also is unpersuasive.  To establish equitable estoppel, the party asserting the doctrine

must establish that i) the other party had full knowledge of the facts, ii) the other party

unreasonably delayed in asserting an available remedy, and 3) the party asserting the doctrine

relied on the other party's delay to its detriment.  *Extreme Constr. Co. v. RCG Glenwood, LLC*,

310 P.3d 246, 252 (Colo. App. 2012) (citing *Manor Vail Condo. Ass'n v. Town of Vail*, 199

Colo. 62, 64, 604 P.2d 1168, 1170 (1980)).  For the same reasons stated above, Mr. Keys and

Mr. Norton's concealment of information they should have disclosed prevents Copper Oaks from

showing the first element, that American Family had full knowledge of the pertinent facts.

Finally, Copper Oaks argues that American Family should be barred from relief based on

the equitable theory of laches.  Under Colorado law, relief is barred if a party engages in

unconscionable delay in enforcing a right that results in prejudice to the one against whom the

claim is asserted.  *Hickerson v. Vessels*, 316 P.3d 620, 623 (Colo. 2014) (quoting *Loveland*

*Camp No. 83 v. Woodmen Bldg. & Benevolent Ass'n*, 108 Colo. 297, 116 P.2d 195, 199 (1941));

*see also Robbins v. People*, 107 P.3d 384, 388 (Colo. 2005).  The elements of laches are: 1) full

knowledge of the facts; 2) unreasonable delay in the assertion of available remedy; and 3)

intervening reliance by and prejudice to another."  *City of Thornton v. Bijou Irr. Co.*, 926 P.2d 1,

73 (Colo.1996) (internal quotations omitted).  Once again, Copper Oaks fails to establish the first

element of this defense.

**CONCLUSION**

The Court finds that, under the standards set forth in the DORA Bulletin, Mr. Keys

engaged in actions that rendered him not "fair and competent" and Mr. Norton engaged in

actions that rendered him not "fair, competent and impartial."   The Court further finds that both

engaged in conduct that prejudiced the appraisal process and distorted the final award.

Accordingly, American Family's Renewed Motion to Vacate Appraisal Award is **GRANTED**.

Mr. Keys and Mr. Norton are **DISQUALIFIED** and the August 8, 2016 Appraisal Award is

**VACATED**.  Judgment will enter in favor of American Family on the first and second claims in

Copper Oaks' Amended Complaint at the conclusion of proceedings in this case.

Pursuant to the reasoning set out in the Order to Show Cause (**#82**), determination of the

amount of the loss was a condition precedent to American Family's obligation to pay in

accordance with the Policy.  Because the vacatur of the appraisal award nullifies any

determination as to amount that existed at the time of filing this action, Copper Oaks had no

standing to bring its third claim, sounding in breach of contract for failure to pay.  Such claim is

therefore **DISMISSED**.

This leaves only Copper Oaks' fourth claim for relief, sounding in unreasonable delay, for determination by trial.  The parties shall begin preparation of a Proposed Pretrial Order as to this claim and within fourteen (14) days shall jointly contact chambers to schedule a Pretrial Conference in anticipation of such a trial.

Dated:  July 23, 2018

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge